IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| MERCY HOUSE TEEN CHALLENGE, <br>     a not-for-profit Corporation on behalf <br>     of itself and all others similarly situated, <br><br>     Plaintiffs, <br><br> v. <br><br> PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN DRUG CORPORATION, <br><br>     Defendants. | CAUSE NO.:    3:18-cv-584-HTW-LRA <br><br><br><br><br><br><br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs, MERCY HOUSE TEEN CHALLENGE, a not-for-profit Corporation on behalf

of itself and all others similarly situated, bring this Complaint against Defendants Purdue Pharma

L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Teva Pharmaceutical

Industries, LTD.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen

Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen

Pharmaceuticals, Inc.; Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.; Noramco,

Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Allergan PLC f/k/a Actavis PLC;

Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc.; Watson Laboratories, Inc.; Actavis LLC;

Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Mallinckrodt plc; Mallinckrodt LLC;

McKesson Corporation; Cardinal Health, Inc.; and AmerisourceBergen Drug Corporation

(collectively "Defendants") and allege as follows:

## I.    **INTRODUCTION**

1.    The United States is in the midst of an opioid epidemic caused by Defendants'

unlawful marketing, sales, and distribution of prescription opioids[1] that has resulted in addiction,

criminal activity, serious health issues, and loss of life.

2.    Plaintiffs bring this civil action to recover monetary losses that have been incurred

as a direct and proximate result of Defendants' false, deceptive, and unfair marketing and/or

diversion of prescription opioids.  Such economic damages were foreseeable to Defendants and

were sustained because of Defendants' unlawful actions and omissions.

3.    Opioid analgesics are widely diverted and improperly used, and the widespread

abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.[2]

4.    The Opioid epidemic is "directly related to the increasingly widespread misuse of

powerful opioid pain medications."[3]

---

[1] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic, and semi-synthetic opiates.
[2] See Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain-Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).
[3] See Robert M. Califf, et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

5.      Plaintiffs bring this suit against the manufacturers of prescription opioids.  The manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction.  These pharmaceutical companies aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous opioids, and turned patients into drug addicts for their own corporate profit. Such actions were unlawful.

6.      Plaintiffs also bring this suit against the wholesale distributors of these highly addictive drugs.  The distributors and manufacturers unlawfully breached their legal duties under federal law to monitor, detect, investigate, refuse, and report suspicious orders of prescription opiates.

## II.      PARTIES

### A.      PLAINTIFFS

7.      Plaintiff, Mercy House Teen Challenge, is a private non-profit corporation organized under the laws of the State of Mississippi, with its principal place of business in Mississippi.

### B.      DEFENDANTS

#### 1.      Manufacturer Defendants

8.      The Manufacturer Defendants are defined below.  At all relevant times, the Manufacturer Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs.  The Manufacturer Defendants, at all times, have manufactured

and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

9.     PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware.  None of its partners are citizens of the State of Mississippi.  PURDUE PHARMA, INC. is a New York corporation with its principal place of business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY, INC. is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue").

10.     Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin®, MS Contin®, Dilaudid®/Dilaudid HP®, Butrans®, Hysingla® ER, and Targiniq™ ER in the United States.  OxyContin® is Purdue's best-selling opioid.  Since 2009, Purdue's annual nationwide sales of OxyContin® have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million.  OxyContin® constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

11.     CEPHALON, INC. ("Cephalon, Inc.") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.

12.     TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petach Tikva, Israel.  In 2011, Teva Ltd. acquired Cephalon, Inc.  TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation which is a wholly owned subsidiary of Teva Ltd. in Pennsylvania.  Teva USA acquired Cephalon, Inc. in October of 2011.

13.     Cephalon, Inc. manufactures, promotes, sells, and distributes opioids such as Actiq® and Fentora® in the United States.  Actiq® has been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who

are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain."[4]  Fentora® has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[5] In 2008, Cephalon, Inc. pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq® and two other drugs, and agreed to pay $425 million.[6]

14.     Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to market and sell Cephalon, Inc. products in the United States.  Teva Ltd. conducts all sales and marketing activities for Cephalon, Inc. in the United States through Teva USA and has done so since its October, 2011 acquisition of Cephalon, Inc.  Teva Ltd. and Teva USA hold out Actiq® and Fentora® as Teva products to the public.  Teva USA sells all former Cephalon, Inc. branded products through its "specialty medicines" division.  The FDA-approved prescribing information and medication guide, which is distributed with Cephalon, Inc. opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.

15.     All of Cephalon, Inc.'s promotional websites, including those for Actiq® and Fentora®, display Teva Ltd.'s logo.[7]  Teva Ltd.'s financial reports list Cephalon, Inc.'s and Teva USA's sales as its own, and its year-end report for 2012 – the year immediately following the

---

[4] *Highlights of Prescribing Information, ACTIQ® (fentanyl citrate) oral transmucosal lozenge, CII (2009).* https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020747s030lbl.pdf.

[5] *Highlights of Prescribing information. FENTORA® (fentanyl citrate) buccal tablet, CII (2011).* https://www.accessdata.fda.gov/drugsatfdadocs/label/2012/021947s015lbl.pdf.

[6] Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/1008/september/08-civ-860.html.

[7] *E.g.,* ACTIQ®, http://www.actiq.com/ (displaying logo at bottom-left) (last visited Aug. 21, 2017).

Cephalon, Inc. acquisition – attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon, Inc.'s specialty sales," including *inter alia* sales of Fentora®.[8]  Through interrelated operations like these, Teva Ltd. operates in the United States through its subsidiaries Cephalon, Inc. and Teva USA.  The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself.  Upon information and belief, Teva Ltd. directs the business practices of Cephalon, Inc. and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder.  Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to as "Cephalon."

16.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.  NORAMCO, INC. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J until July of 2016.  ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.  JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.  J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products.  Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs

---

[8] Teva Ltd., Annual Report (Form 20-F) 62 (Feb. 12, 2013),
http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2012.pdf.

and Janssen's profits inure to J&J's benefit.  Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., Noramco, and J&J are referred to as "Janssen."

17.      Janssen manufactures, promotes, sells, and distributes drugs in the United States, including the opioid Duragesic® (fentanyl).  Before 2009, Duragesic® accounted for at least $1 billion in annual sales.  Until January, 2015, Janssen developed, marketed, and sold the opioids Nucynta® (tapentadol) and Nucynta® ER.  Together, Nucynta® and Nucynta® ER accounted for $172 million in sales in 2014.

18.      ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  ENDO PHARMACEUTICALS, INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to as "Endo."

19.      Endo develops, markets, and sells prescription drugs, including the opioids Opana®/Opana® ER, Percodan®, Percoset®, and Zydone®, in the United States.  Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012.  Opana® ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012.  Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

20.      ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.  ACTAVIS PLC acquired ALLERGAN PLC in March, 2015, and the combined company changed its name to ALLERGAN PLC in January,

2013. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October, 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then ACTAVIS PLC in October, 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. is a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by ALLERGAN PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, ALLERGAN PLC exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. Allergan PLC, Actavis PLC, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to as "Actavis."

21.     Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian® and Norco®, a generic version of Kadian®, and generic versions of Duragesic® and Opana®, in the United States. Actavis acquired the rights to Kadian® from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian® in 2009.

22.     MALLINCKRODT PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. MALLINCKRODT LLC is a limited liability company organized and existing under the laws of the State of Delaware. Mallinckrodt LLC has no members that are citizens of the State of

Mississippi and is a wholly owned subsidiary of Mallinckrodt plc.  Mallinckrodt plc and Mallinckrodt LLC are referred to as "Mallinckrodt."

23.     Mallinckrodt manufactures, markets, and sells drugs in the United States including generic oxycodone, of which it is one of the largest manufacturers.  In July of 2017 Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

### 2.     Distributor Defendants

24.     The Distributor Defendants also are defined below.  At all relevant times, the Distributor Defendants have distributed, supplied, sold, and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes.  The Distributor Defendants universally failed to comply with federal law.  Plaintiffs allege the unlawful conduct by the Distributor Defendants is responsible for the volume of prescription opioids plaguing the United States.

25.     MCKESSON CORPORATION ("McKesson") is a Delaware corporation, with its principal place of business located in San Francisco, California.  McKesson distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states.

26.     CARDINAL HEALTH, INC. ("Cardinal") is an Ohio corporation with its principal place of business located in Dublin, Ohio.  Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states.

27.     AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania.

AmerisourceBergen distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states.

## III.    JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction under 28 U.S.C § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

29.    This Court independently has subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1332(d)(2)(A), because the matter in controversy, the aggregated claims of the individual Class members, exceeds the sum of five million dollars, exclusive of interest and costs, and Plaintiffs, MERCY HOUSE TEEN CHALLENGE, a not-for-profit Corporation on behalf of itself and all others similarly situated, members of the proposed Class, are citizens of states different from several of the Defendants.  Under 28 U.S.C. § 1332(d)(5), there are more than 100 members of the proposed Class.

30.    This Court has personal jurisdiction over Defendants because all the Defendants purposefully conduct substantial business in this State and in this judicial district.

31.    This Court also has personal jurisdiction over all of the Defendants under 18 U.S.C. § 1965(b).  This Court may exercise nation-wide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiffs demonstrate national contacts.  Here, the interests of justice require that Plaintiffs be allowed to bring all members of nationwide RICO enterprise before the court in a single trial.  *See, e.g., Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris Inc.,* 23 F. Supp. 2d 796 (1998) (citing *LaSalle National Bank v.*

*Arroyo Office Plaza, Ltd.,* 1988 WL 23824, *3 (N.D. Ill. Mar 10, 1988); *Butcher's Union Local No. 498 v. SDC Invest., Inc.,* 788 F.2d 535, 539 (9th Cir. 1986)).

32.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Plaintiff MERCY HOUSE TEEN CHALLENGE is domiciled in this judicial district, because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district, and under 28 U.S.C. § 1391(b)(1) and (c)(2), because all the Defendants are subject to personal jurisdiction in this state and in this judicial district, such that Defendants are deemed to reside in this state and in this judicial district.

## IV.     FACTUAL BACKGROUND

### A.     THE OPIOID EPIDEMIC

#### The National Opioid Epidemic

33.     The past two decades have been characterized by increasing abuse and diversion of prescription drugs, including opioid medications, in the United States.[9]

34.     Prescription opioids have become widely prescribed.  By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[10]

35.     By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. The News Release noted:

> a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

---

[9] *See* Richard C. Dart, et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).
[10] Katherine M. Keyes, et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

    b. More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin®), methadone, oxycodone (OxyContin®), and oxymorphone (Opana®).

    c. Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

    d. The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older-a total of 12 million people-reported using prescription painkillers nonmedically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300% since 1999.

    e. Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

    f. Almost 5,500 people start to misuse prescription painkillers every day.[11]

36. The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.[12]

37. Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is unacceptable. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22% over the 52,404 drug deaths recorded the previous year.[13]

38. Moreover, the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin.[14]

---

[11] *See* Press Release, Crts. For Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[12] *See* Califf, et al., supra note 3.

[13] *See* Ctrs. For Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-oversode-deathestimates.pdf.

[14] *See* Ctrs. For Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Today's Heroin Epidemic*, https://www.cdc.gov/vitalsigns/heroin/indes.html (last updated July 7, 2015).

39. Heroin is pharmacologically similar to prescription opioids. The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use.[15]

40. The CDC reports that drug overdose deaths involving heroin continued to climb sharply, with heroin overdoses more than tripling in 4 years. This increase mirrors large increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence. *Past misuse of prescription opioids is the strongest risk factor for heroin initiation and use*, specifically among persons who report past-year dependence or abuse. The increased availability of heroin, combined with its relatively low price (compared with diverted prescription opioids) and high purity appear to be major drivers of the upward trend in heroin use and overdose.[16]

41. The societal costs of prescription drug abuse are "huge."[17]

42. Across the nation, treatment facilities are struggling with a pernicious, ever-expanding epidemic of opioid addiction and abuse. Every day, more than 90 Americans lose their lives after overdosing on opioids.[18]

43. The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[19]

---

[15] *See* Wilson M. Compton, *Relationship Between Nonmedical Prescription-Opioid Use and Heroin*, 374 N. Eng. J. Med. 154 (2016).

[16] *See* Rose A. Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).

[17] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *10 [hereinafter Brief of HDMA].

[18] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis last visited Sept. 19, 2017) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, Savid F, Scholl L, Increases in Drug and Opioid-Involved Overdose Deaths – United States, 2010-2015, *MMWR MORB MORTAL WKLY REP*. 2016; 65, doi: 10.15585/mmwr.mm655051 el).

[19] Opioid Crisis, NIH.

The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[20]

44.     The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999-2014.  Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[21]

45.     The rate of death from opioid overdose has quadrupled during the past 15 years in the United States.  Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[22]

46.     Every day brings a new revelation regarding the depth of the opioid plague:  just to name one example, the New York Times reported in September, 2017 that the epidemic, which now claims 60,000 lives a year, is now killing babies and toddlers because ubiquitous, deadly opioids are "everywhere" and mistaken as candy.[23]

47.     In 2016, the President of the United States declared an opioid and heroin epidemic.[24]

48.     The epidemic of prescription pain medication and heroin deaths is devastating families and communities across the country.[25]  Meanwhile, the manufacturers and distributors of prescription opioids extract billions of dollars of revenue from the addicted American public

---

[20] *Id*. (citing at note 2 Florence CS, Zhou C, Lou F, XuL, <u>The Economic Burden of Prescription Opioid Overdose, Abuse and Dependence in the United States, 2013</u>, *MED CARE* 2016; 54(10):901-906, doi:10.1097/MLR.0000000000000625).

[21] *See* Rose A. Rudd, et al., *Increases in Drug and opioid-Involved Overdose Deaths – United States, 2010-2016*, 65 Morbidity & Mortality Wkly. Rep. 1445 (2016).

[22] *See* Volkow & McLellan, *supra* note 1.

[23] Julie Turkewitz, '<u>The Pills are everywhere':  How the Opioid Crisis Claims Its Youngest Victims</u>, N.Y. Times, Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

[24] *See* Proclamation No. 9499, 81 Fed. Reg. 65, 173 (Sept 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week").

[25] *See* Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres. Doc. 743 (Oct. 21, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf.

while tens of millions of dollars of injury are caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.

49.     The prescription opioid manufacturers and distributors, including the Defendants, have continued their wrongful, intentional, and unlawful conduct, despite their knowledge that such conduct is causing and/or continuing the national, state, and local opioid epidemic.

**B.     THE MANUFACTURER DEFENDANTS' FALSE, DECEPTIVE, AND UNFAIR MARKETING OF OPIOIDS**

50.     The opioid epidemic did not happen by accident.

51.     Before the 1990's, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care.  Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited.  As a result, doctors generally did not prescribe opioids for chronic pain.

52.     Each Manufacturer Defendant has conducted, and has continued to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids.  In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.

53.     The Manufacturer Defendants have made false and misleading claims, contrary to the language on their drugs' labels, regarding the risks of using their drugs that: (1) downplayed

15

the serious risk of addiction; (2) created and promoted the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction.  The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Manufacturer Defendants' claims.

54.     The Manufacturer Defendants have disseminated those common messages to reverse the popular and medical understanding of opioids and risks of opioid use.  They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, and through unbranded marketing and industry-funded front groups.

55.     Defendants' efforts have been wildly successful.  Opioids are now the most prescribed class of drugs.  Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009.[26]  In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[27]  This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and

---

[26] *See* Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine,* Fortune, Nov. 9, 2011, http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/; David Crow, *Drugmakers Hooked on $10bn Opioid Habit*, Fin. Times, Aug. 10, 2016, https://www.ft.com/content/f6e989a8-5dac-11e6-bb77-a121aa8abd95.
[27] Letter from Vivek H. Murthy, U.S. Surgeon General (Aug. 2016), http://turnthetiderx.org/.

psychologically dependent on them (the demand).  And when those patients can no longer afford or obtain opioids from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

56.     The Manufacturer Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

### 1.     Each Manufacturer Defendant Used Multiple Avenues To Disseminate Their False And Deceptive Statements About Opioids

57.     The Manufacturer Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients throughout the United States. Defendants also deployed seemingly unbiased and independent third-parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the State and Plaintiffs' Communities.

58.     Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters.  This comprehensive approach ensures that the Manufacturer Defendants' messages are accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising – and in each sales territory.  The Manufacturer Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

59.     The Manufacturer Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising.  The Manufacturer Defendants' sales representatives and physician speakers were

required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

### a.     Direct Marketing

60.     The Manufacturer Defendants' direct marketing of opioids generally proceeded on two tracks.  First, each Manufacturer Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of their branded drugs.  For example, upon information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

61.     Many of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain.  For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana® ER with photographs depicting patients with physically demanding jobs like a construction worker, chef, and teacher, misleadingly implying that the drug would provide long-term pain-relief and functional improvement.  Upon information and belief; Purdue also ran a series of ads, called "Pain Vignettes," for OxyContin® in 2012 in medical journals.  These ads featured chronic pain patients and recommended OxyContin® for each.  One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin® would help the writer work more effectively.

62.     Second, each Manufacturer Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs.  The Manufacturer Defendants have not corrected this misinformation.  Instead, each Defendant devoted massive resources to direct sales contacts with doctors.  Upon information and belief, in 2014 alone, the Manufacturer Defendants

spent in excess of $168 million on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

63.     The Manufacturer Defendants' detailing to doctors is effective.  Numerous studies indicate that marketing impacts prescribing habits, with fact-to-face detailing, having the greatest influence.  Even without such studies, the Manufacturer Defendants purchase, manipulate and analyze some of the most sophisticated data available in any industry, data available from IMS Health Holdings, Inc., to track, precisely, the rates of initial prescribing and renewal by individual doctors, which in turn allows them to target, tailor, and monitor the impact of their core messages.  Thus, the Manufacturer Defendants know their detailing to doctors is effective.

64.     The Manufacturer Defendants' detailers have been reprimanded for their deceptive promotions.  In March, 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated."  Those materials in particular "fail to reveal warnings regarding potentially fatal abuse of opioids, used by individuals other than the patient for whom the drug was prescribed."[28]

### b.     *Indirect Marketing*

65.     The Manufacturer Defendants' indirectly marketed their opioids using unbranded advertising, paid speakers and "Key Opinion Leaders" ("KOLs"), and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

---

[28] Letter from Thomas Abrams, Dire., Div. of Drug Mktg., Advert., 7 Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), http://www.fdanews.com/ext/resources/files/archives/a/ActabisElizabeth LLC.pdf.

66.     The Manufacturer Defendants deceptively marketed opioids throughout the
United States through unbranded advertising – e.g., advertising that promotes opioid use
generally but does not name a specific opioid.  This advertising was ostensibly created and
disseminated by independent third-parties.  But by funding, directing, reviewing, editing, and
distributing this unbranded advertising, the Manufacturer Defendants controlled the deceptive
messages disseminated by these third-parties and acted in concert with them to falsely and
misleadingly promote opioids for the treatment of chronic pain.  Much as Defendants controlled
the distribution of their "core messages" via their own detailers and speaker programs, the
Manufacturer Defendants similarly controlled the distribution of these messages in scientific
publications, treatment guidelines, Continuing Medical Education ("CME") programs, and
medical conferences and seminars.  To this end, the Manufacturer Defendants used third-party
public relations firms to help control those messages when they originated from third-parties.

67.     The Manufacturer Defendants marketed through third-party, unbranded
advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically
is not reviewed by the FDA.  The Manufacturer Defendants also used third-party, unbranded
advertising to give the false appearance that the deceptive messages came from an independent
and objective source.  Like the tobacco companies, the Manufacturer Defendants used third-
parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive
doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

68.     Defendants also identified doctors to serve, for payment, on their speakers'
bureaus and to attend programs with speakers and meals paid for by Defendants.  These speaker
programs provided:  (1) an incentive for doctors to prescribe a particular opioid (so they might be
selected to promote the drug); (2) recognition and compensation for the doctors selected as

speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers.
These speakers give the false impression that they are providing unbiased and medically accurate
presentations when they are, in fact, presenting a script prepared by Defendants.  On information
and belief, these presentations conveyed misleading information, omitted material information,
and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

69.     Borrowing a page from Big Tobacco's playbook, the Manufacturer Defendants
worked through third-parties they controlled by: (a) funding, assisting, encouraging, and
directing doctors who served as KOLs, and (b) funding, assisting, directing, and encouraging
seemingly neutral and credible Front Groups.  The Manufacturer Defendants then worked
together with those KOLs and Front Groups to taint the sources that doctors and patients relied
on for ostensibly "neutral" guidance, such as treatment guidelines, CME programs, medical
conferences and seminars, and scientific articles.  Thus, working individually and collectively,
and through these Front Groups and KOLs, the Manufacturer Defendants persuaded doctors and
patients that what they have long known – that opioids are addictive drugs, unsafe in most
circumstances for long-term use – was untrue, and that the compassionate treatment of pain
required opioids.

70.     In 2007, multiple States sued Purdue for engaging in unfair and deceptive
practices in its marketing, promotion, and sale of OxyContin®.  Certain states settled their claims
in a series of Consent Judgments that prohibited Purdue from making misrepresentations in the
promotion and marketing of OxyContin® in the future.  By using indirect marketing strategies,
however, Purdue intentionally circumvented these restrictions.  Such actions include contributing
to the creation of misleading publications and prescribing guidelines which lack reliable
scientific basis and promote prescribing practices which have worsened the opioid crisis.

21

71.     Pro-opioid doctors are one of the most important avenues that the Manufacturer Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use.  The Manufacturer Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.  For example, the State of New York found in its settlement with Purdue that the Purdue website "In the Face of Pain" failed to disclose that doctors who provided testimonials on the site were paid by Purdue and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

72.     Defendants utilized several KOLs, including many of the same ones.

73.     Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom the Manufacturer Defendants identified and promoted to further their marketing campaign.  Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue.  Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain.  He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1996 and again in 2009.  He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by the Manufacturer Defendants.

74.     Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations, such as his claim that "the likelihood that the treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low."

He appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat chronic pain.  On this widely-etched program, broadcast across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon.  If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[29]

75.     Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."  These lectures falsely claimed that fewer than 1% of patients would become addicted to opioids.  According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks.  Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[30]  Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation?  Well, . . . I guess I did."[31]

76.     Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah.  Dr. Webster was President of American Academy of Pain Medicine ("AAPM") in 2013.  He is a Senior Editor of Pain Medicine, the same journal that published Endo's special advertising supplements touting Opana® ER.  Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue.  At the same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants (including nearly $2 million from Cephalon).

---

[29] Good Morning America (ABC television broadcast Aug. 30, 2010).
[30] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts,* Wall St. J., Dec. 17, 2012, https://www.wsj.como/articles.SB10001424127887324478304578173342657044604.
[31] *Id.*

77.     During a portion of his time as a KOL, Dr. Webster was under investigation for overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010.  Although the investigation was closed without charges in 2014, more than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

78.     Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids.  The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines.  Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue.  Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating, also, their reliance on the Manufacturer Defendants and those under their influence and control.

79.     In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue entitled "Managing Patient's Opioid Use:  Balancing the Need and the Risk," Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths."  This webinar was available to and was intended to reach doctors throughout the United States.[32]

80.     Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of

---

[32] *See* Emerging Solutions in Pain, *Managing Patient's Opioid Use: Balancing the Need and the Risk*, http://www.emergingsolutionsinpain.com/ce-education/opioid-management:option= com_continued&view =frontmatter&Itemid=303&course=209 (last visited Aug. 22, 2017).

undertreated pain.  In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids.  As he and co-author Beth Dove wrote in their 2007 book <u>Avoiding Opioid Abuse While Managing Pain</u> – a book that is still available online – when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."[33]  Upon information and belief, Endo distributed this book to doctors.  Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[34]

81.    The Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain.  Under the direction and control of the Manufacturer Defendants, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy.  They also assisted the Manufacturer Defendants by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

82.    These Front Groups depended on the Manufacturer Defendants for funding and, in some cases, for survival.  The Manufacturer Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination.  In doing so, the Manufacturer Defendants made sure that the Front Groups would generate only the messages that the Manufacturer Defendants wanted to

---

[33] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).
[34] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee, Wisc. J. Sentinel, Feb. 18, 2012, http://archive.jsonline.com/watchdog/watchdogreports/;ainkiller-boom-fueled-by-networking-dp3p2rn-139609053.html.

distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

83. Defendants Cephalon, Endo, Janssen, and Purdue, in particular, utilized many Front Groups, including many of the same ones. Several of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), the Center for Practical Bioethics ("CPB"), the U.S. Pain Foundation ("USPF"), and Pain & Policy Studies Group ("PPSG").[35]

84. The most prominent of the Manufacturer Defendants' Front Groups was the American Pain Foundation ("APF"), which, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007, primarily from Endo and Purdue, until it closed its doors in May, 2012. APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television, and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach citizens of all 50 states.

85. In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects. APF received

---

[35] See generally, e.g., Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015), https://www.finance.senate.gov/imo/media/doc/050517%20/sebatir%20Wyden%20to%20Secretary%20Price%20re%20 0FDA%20Opioid%20Working%20Group.pdf.

about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million.  By 2011, upon information and belief, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.

86.     APF held itself out as an independent patient advocacy organization.  It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors.  Upon information and belief, it was often called upon to provide "patient representatives" for the Manufacturer Defendants' promotional activities, including for Purdue's Partners Against Pain and Janssen's Let's Talk Pain.  APF functioned largely as an advocate for the interests of the Manufacturer Defendants, not patients. Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

87.     Plaintiffs are informed, and believe, that on several occasions, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue.  APF then submitted grant proposals seeking to find these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

88.     The U.S. Senate Finance Committee began looking into APF in May, 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers.  The investigation caused considerable damage to APF's credibility as an objective and neutral third-party, and the Manufacturer Defendants stopped funding it.  Within

days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[36]

89.     Another Front Group for the Manufacturer Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement, and funding of the Manufacturer Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

90.     AAPM received substantial funding from opioid manufacturers. For example, AAPM maintained a corporate relations council, whose members were paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allowed drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

91.     Upon information and belief, AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone.

---

[36] Charles Ornstein & Tracy Weber, *Senate Panel Investigates Drug Companies' Ties to Pain Groups,* Wash. Post, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html.

AAMP's presidents have included top industry-supported KOLs Perry Fine and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation.

92.     The Manufacturer Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

93.     In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patients' addiction to opioids was low.  Dr. Haddox, who co-authored the AAPM/APS statement, was a paid speaker for Purdue at the time.  Dr. Portenoy was the sole consultant.  The consensus statement remained on AAPM's website until 2011, and, upon information and belief, was taken down from AAPM's website only after a doctor complained.[37]

94.     AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[38]  Treatment guidelines have been relied upon by doctors, especially the general practitioners and family doctors targeted by the Manufacturer Defendants.  Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications.  Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

95.     At least 14 of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.  The 2009 Guidelines promote opioids as "safe and

---

[37] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).
[38] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. Pain 113 (2009).

effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[39]  One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Manufacturer Defendants, made to the sponsoring organizations and committee members.  These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in the State and/or Plaintiffs' Communities during the relevant time period, are still available online, and were reprinted in the Journal of Pain.  The Manufacturer Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Manufacturer Defendants financial support to members of the panel.

96.     The Manufacturer Defendants worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy.  For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project.  PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Manufacturer Defendants.  Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and

---

[39] *Id.*

did not require mandatory participation by prescribers, which the Manufacturer Defendants

determined would reduce prescribing.

> ### 2. The Manufacturer Defendants' Marketing Scheme Misrepresented The Risks And Benefits Of Opioids
>
> > #### a. *The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs*

97.    To falsely assure physicians and patients that opioids are safe, the Manufacturer

Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use,

particularly the risk of addiction, through a series of misrepresentations that have been

conclusively debunked by the FDA and CDC.  These misrepresentations – which are described

below – reinforced each other and created the dangerously misleading impression that:  (1)

starting patients on opioids was low risk because most patients would not become addicted, and

because those at greatest risk for addiction could be identified and managed; (2) patients who

displayed signs of addiction probably were not addicted and, in any event, could easily be

weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain

pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-

deterrent opioids both prevent abuse and overdose and are inherently less addictive.  The

Manufacturer Defendants have not only failed to correct these misrepresentations, they continue

to make them today.

98.    Opioid manufacturers, including Defendants Endo Pharmaceuticals, Inc. and

Purdue Pharma L.P., have entered into settlement agreements with public entities that prohibit

them from making many of the misrepresentations identified in this Complaint.  Yet even

afterward, each Manufacturer Defendant continued to misrepresent the risks and benefits of

long-term opioid use and each continues to fail to correct its past misrepresentations.

99.     Some illustrative examples of the Manufacturer Defendants' false, deceptive, and

unfair claims about the purportedly low risk of addiction include:

a.  Actavis' predecessor caused a patient education brochure, *Managing Chronic
    Back Pain*, to be distributed beginning in 2003 that admitted that opioid
    addiction is possible, but falsely claimed that it is "less likely if you have
    never had an addiction problem."  Based on Actavis' acquisition of its
    predecessor's marketing materials along with the rights to Kadian®, it appears
    that Actavis continued to use the brochure in 2009 and beyond.

b.  Cephalon and Purdue sponsored APF's *Treatment Options: A guide for
    People Living with Pain* (2007), which suggested that addiction is rare and
    limited to extreme cases of unauthorized dose escalations, obtaining
    duplicative opioid prescriptions from multiple sources, or theft.  This
    publication is still available online.[40]

c.  Endo sponsored a website, "PainKnowledge," which, upon information and
    belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually
    do not become addicted."  Upon information and belief, another Endo
    website, PainAction.com, stated "Did you know?  Most chronic pain
    patients do not become addicted to the opioid medications that are prescribed
    for them." Endo also distributed an "Informed Consent" document on
    PainAction.com that misleadingly suggested that only people who "have
    problems with substance abuse and addiction" are likely to become addicted
    to opioid medications.

d.  Upon information and belief, Endo distributed a pamphlet with the Endo logo
    entitled *Living with Someone with Chronic Pain*, which stated that: "Most
    health care providers who treat people with pain agree that most people do not
    develop an addiction problem."

e.  Janssen reviewed, edited, approved, and distributed a patient education guide
    entitled *Finding Relief: Pain Management for Older Adults* (2009), which
    described as "myth" the claim that opioids are addictive, and asserted as fact
    that "[m]any studies show that opioids are rarely addictive when used
    properly for the management of chronic pain."

f.  Janssen currently runs a website, Presciberesponsibly.com (last updated July
    2, 2015), which claims that concerns about opioid addiction are
    "overestimated."

g.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain and
    Its Management*, which claims that less than 1% of children prescribed
    opioids will become addicted and that pain is undertreated due to
    "[m]isconceptions about opioid addiction."[41]

h.  Consistent with the Manufacturer Defendants' published marketing materials,
    upon information and belief, detailers for Purdue, Endo, Janssen, and

---

[40] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) [hereinafter APF, *Treatment
Options*], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.
[41] Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF,
*Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

Cephalon minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

i.    Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF, NPF (National Pain Foundation), and NFTP (the National Foundation for the Treatment of Pain) argued in an *amicus* brief to the United States Fourth Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by their KOL, Dr. Portenoy.[42]

100.    These claims are contrary to longstanding scientific evidence.  A 2016 opioid-prescription guideline issued by the CDC (the "2016 CDC Guideline") explains that there is "[e]xtensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction], [and] overdose . . . )."[43]  The 2016 CDC Guideline further explains that "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[44]

101.    The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for extended-release and long-acting ("ER/LA") opioids in 2013 and for immediate release ("IR") opioids in 2016.  In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death."  According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse,

---

[42] Brief of the American Pain Foundation, the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz,* No. 05-4474 (4th Cir. Sept. 8, 2005) [hereinafter Brief of APF] at 9.

[43] Deborah Dowell, et al., *CDC Guideline for Prescribing Opioids for Chronic Pain-United States, 2016*, Morbidity & Mortality Wkly. Rep., Mar. 18, 2016, at 15 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[44] *Id.* at 2, 25.

and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed.[45]

102.    The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."[46]  Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found that Endo had no evidence for that statement.  Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York.  Endo remains free, however, to make those statements in this State.

103.    In addition to mischaracterizing the highly addictive nature of the drugs they were pushing, the Manufacturer Defendants also fostered a fundamental misunderstanding of the signs of addiction.  Specifically, the Manufacturer Defendants misrepresented, to doctors and patients, that warning signs and/or symptoms of addiction were, instead, signs of undertreated pain (i.e.

---

[45] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Andrew Koldny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), https://www.regulations.gov/contentStreamer:documentID=FDA-2012-P-0818-0793&attachment Number=1&contentType=pdf.; Letter from Janet Woodcock, M.D., Dire., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan and Becker, LLP (Mar. 22, 2016), https://www.regulations.gov/contentStreamer:documentID=FDA-2014-P-0205-0006&attachmentNumber=1&contentType=pdf.

[46] Assurance of Discontinuance, *In re Endo Health Solutions Inc. and Endo Pharm. Inc.* Assurance No. 15-228), at 16, https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

pseudoaddiction) – and instructed doctors to increase the opioid prescription dose for patients who were already in danger.

104. To this end, one of Purdue's employees, Dr. David Haddox, invented a phenomenon called "pseudoaddiction." KOL Dr. Portenoy popularized the term. Examples of the false, misleading, deceptive, and unfair statements regarding pseudoaddiction include:

a. Cephalon and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids and hoarding, are all signs of pseudoaddiction, rather than true addiction.[47] The 2012 edition, which remains available for sale online, continues to teach that pseudoaddiction is real.[48]

b. Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

c. Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

d. Purdue published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which, upon information and belief, described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in "patients who have pain that has not been effectively treated."

e. Upon information and belief, Purdue sponsored a CME program titled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse." In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

---

[47] Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2007) at 62.
[48] *See* Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Clinician's Guide* (2d ed. 2012).

105.     In the 2016 CDC Guideline, the CDC rejects the validity of the pseudoaddiction fallacy invented by a Purdue employee as a reason to push more opioid drugs onto already addicted patients.

106.     In addition to misstating the addiction risk and inventing the pseudoaddiction falsehood, a third category of false, deceptive, and unfair practice is the Manufacturer Defendants' false instructions that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Manufacturer Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Manufacturer Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

   a. Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers' bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.
   b. Purdue, upon information and belief, sponsored a 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescription" and "overdose deaths."
   c. As recently as 2015, upon information and belief, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

107.    The 2016 CDC Guideline confirms the falsity of these claims.  The Guideline explains that there are no studies assessing the effectiveness of risk mitigation strategies "for improving outcomes related to overdose, addiction, abuse or misuse."[49]

108.    A fourth category of deceptive messaging regarding dangerous opioids is the Manufacturer Defendants' false assurances regarding the alleged ease of eliminating opioid dependence.  The Manufacturer Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, but they failed to disclose the increased difficulty of stopping opioids after long-term use.  In truth, the 2016 CDC Guideline explains that the symptoms of opioid withdrawal include abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia, drug cravings, anxiety, insomnia, and spontaneous abortion and premature labor in pregnant women.[50]

109.    The Manufacturer Defendants nonetheless downplayed the severity of opioid detoxification.  For example, upon information and belief, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.  And Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.[51]

110.    A fifth category of false, deceptive, and unfair statements the Manufacturer Defendants made to sell more drugs is that opioid dosages could be increased indefinitely without added risk.  The ability to escalate dosages was critical to Defendants' efforts to market

---

[49] *Id*. at 11.
[50] *Id*. at 26.
[51] APF, *Policymaker's Guide, supra* note 48, at 32.

opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors

would have abandoned treatment when patients built up tolerance and lower dosages did not

provide pain relief.  The Manufacturer Defendants' deceptive claims include:

a. Upon information and belief, Actavis' predecessor created a patient brochure for Kadian® in 2007 that stated, "Over time, your body may become tolerant of your current dose.  You may require a dose adjustment to get the right amount of pain relief.  This is not addiction."  Based on Actavis' acquisition of its predecessor's marketing materials along with the rights to Kadian®, Actavis appears to have continued to use these materials in 2009 and beyond.

b. Cephalon and Purdue sponsored APF's *Treatment Option: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed.  The guide stated that opioids have "no ceiling dose" and insinuated that they are therefore the most appropriate treatment for sever pain.[52]

c. Endo sponsored a website, PainKnowledge, which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

d. Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?"  The response is, "The dose can be increased . . ..  You won't 'run out' of pain relief."[53]

e. Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f. Upon information and belief, Purdue's In the Face of Pain website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," and that "the need for higher doses of medication is not necessarily indicative of addiction," but inaccurately downplayed the risks from high opioid dosages.[54]

h. In 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit and available until at least 2012. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

---

[52] APF, *Treatment Options, supra* note 47, at 12.
[53] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.S., ed., 2004).
[54] APF, *Policymaker's Guide, supra* note 48, at 32.

    i.   Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose.[55]

    j.   Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF, NPF, and NFTP argued in an *amicus* brief to the United States Forth Circuit of Appeals that "there is no 'ceiling dose'" for opioids.[56]

111.    Once again, the 2016 CDC Guideline reveals that the Manufacturer Defendants' representations regarding opioids were lacking in scientific evidence.  The 2016 CDC Guideline clarifies that the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."[57] More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[58]  The CDC also states that there is an increased risk "for opioid use disorder, respiratory depression, and death at higher dosages."[59] That is why the CDC advises doctors to "avoid increasing dosage" to above 90 morphine milligram equivalents per day.[60]

112.    Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can cure addiction and abuse.

113.    The Manufacturer Defendants made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse.  For example, Endo's

---

[55] The College on Problems of Drug Dependence, *About the College*, http://cpdd.org (last visited Aug. 21, 2017).
[56] Brief of APF, *supra* note 49, at 9.
[57] 2016 CDC Guideline, *supra* note 50, at 22-23.
[58] *Id*. at 23-24.
[59] *Id*. at 21.
[60] *Id*. at 16.

advertisements for the 2012 reformulation of Opana® ER claimed that it was designated to be crush resistant, in a way that suggested it was more difficult to abuse.  This claim was false.  The FDA warned in a 2013 letter that Opana® ER Extended-Release Tablets' "extended-release features can be compromised, causing the medication to 'dose dump,' when subject to . . . forms of manipulation such as cutting, grinding, or chewing, followed by swallowing."[61]  Also troubling, Opana® ER can be prepared for snorting using commonly available methods and "readily prepared for injection."[62]  The letter discussed "the troubling possibility that a higher (and rising) percentage of [Opana ER Extended-Release Tablet] abuse is occurring via injection."[63]  Endo's own studies, which it failed to disclose, showed that Opana® ER could still be ground and chewed.  In June 2017, the FDA requested that Opana® ER be removed from the market.

> **b.    The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs**

114.    To convince doctors and patients that opioids should be used to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was a significant upside to long-term opioid use.  But as the CDC Guideline makes clear, "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-

---

[61] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Barto, Vice President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 5.
[62] *Id*. at 6.
[63] *Id*. at 6 n.21.

term opioid use.[64] The FDA, too, has recognized the lack of evidence to support long-term opioid use.  Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

115.     Some illustrative examples of the Manufacture Defendants' false claims are:

a.   Upon information and belief, Actavis distributed an advertisement claiming that the use of Kadian® to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

b.   Endo distributed advertisements that claimed that the use of Opana® ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

c.   Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) – which states as "a fact" that "opioids may make it easier for people to live normally."  The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

d.   Janssen promoted Ultracet® for everyday chronic pain and distributed posters for display in doctors' offices of presumed patients in active professions; the caption read, "Pain doesn't fit into their schedules."

e.   Upon information and belief, Purdue ran a series of advertisements for OxyContin® in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin® for them.  The ads implied that OxyContin® improves patients' function.

f.   *Responsible Opioid Prescribing* (2007), sponsored and distributed by Cephalon, Endo, and Purdue taught that relief of pain by opioids, by itself, improved patients' function.

g.   Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve."[65]  This publication is still available online.

h.   Endo's NIPC website "PainKnowledge" claimed in 2009, upon information and belief, that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse."  Elsewhere, the website touted improved quality of life (as well as "improved

---

[64] *Id.* at 15.
[65] APF, *Treatment Options*, *supra* note 47.

function") as benefits of opioid therapy.  The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

i. Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient."[66]  Upon information and belief, a CME disseminated via webcast claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

j. Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain."  One feature of the campaign was to complain that patients were under-treated.  In 2009, upon information and belief, a Janssen-sponsored website, part of the "Let's Talk Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

k. Purdue sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[m]ultiple clinical studies" have shown that opioids are effective in improving "[d]aily function," "[p]sychological health," and "[o]verall health-related quality of life for chronic pain."[67]  The Policymaker's Guide was originally published in 2011.

l. Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

116.  As the FDA and other agencies have made clear for years, these claims have no support in the scientific literature.

117.  In 2010, the FDA warned Actavis, in response to its advertising of Kadian® described above, that "we are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[68]  And in 2008, upon information and belief, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the

---

[66] *E.g.,* NIPC, *Persistent Pain and the Older Patient* (2007), https://www.painedu.org/Downloads/NIPC/Activities/B173_Providence_RI_%20Invite.pdf.
[67] APF, *Policymaker's Guide, supra* note 48, at 29.
[68] Letter from Thomas Abrams to Doug Boothe, *supra* note 32.

42

drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

118. The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by the Manufacturer Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which there are alternative treatment options" like non-opioid drugs "are inadequate." And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.[69] Purdue misleadingly promoted OxyContin® as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin® does not last for 12 hours – a fact that Purdue has known at all times relevant to this action. Upon information and belief, Purdue's own research shows that OxyContin® wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin® tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin® experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin®

---

[69] 2016 CDC Guideline, *supra* note 50, at 12.

more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin® before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

119.    Purdue's competitors were aware of this problem.  For example, upon information and belief, Endo ran advertisements for Opana® ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin® as if it were effective for a full 12 hours. Upon information and belief, Purdue's sales representatives continue to tell doctors that OxyContin® lasts a full 12 hours.

120.    Front Groups supported by Purdue likewise echoed these representations.  For example, in an amicus brief submitted to the Supreme Court of Ohio by the American Pain Foundation, the National Foundation for the Treatment of Pain, and the Ohio Pain Initiative in support of Purdue, those amici represented:

> OxyContin is particularly useful for sustained long-term pain because it comes in higher, compact pills with a slow release coating.  OxyContin pills can work for 12 hours.  This makes it easier for patients to comply with dosing requirements without experiencing a roller-coaster of pain relief followed quickly by pain renewal that can occur with shorter acting medications.  It also helps the patient sleep through the night, which is often impossible with short-acting medications.  For many of those serviced by Pain Care Amici, OxyContin has been a miracle medication.[70]

121.    Cephalon deceptively marketed its opioids Actiq® and Fentora® for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid tolerant individuals.  Both Actiq® and Fentora® are extremely powerful fentanyl-based IR opioids.  Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq® for anything but cancer

---

[70] Reply Brief of Amicus Curiae of the American Pain Foundation, The National Foundation for the Treatment of Pain, and the Ohio Pain Initiative Supporting Appellants, *Howland v. Purdue Pharma L.P.*, No. 2003-1538 (Ohio Apr. 13, 2004), 2004 WL 1637768, at *4 (footnote omitted).

pain, and refused to approve Fentora® for the treatment of chronic pain because of the potential

harm, including the high risk of "serious and life-threatening adverse events" and abuse – which

are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007

emphasizing that Fentora® should only be used for cancer patients who are opioid-tolerant and

should not be used for any other conditions, such as migraines, post-operative pain, or pain due

to injury.[71] Specifically, the FDA advised that Fentora® "is only approved for breakthrough

cancer pain in patients who are *opioid-tolerant*, meaning those patients who take a regular, daily,

around-the-clock narcotic pain medication."[72]

122. Despite this, Cephalon conducted and continues to conduct a well-funded

campaign to promote Actiq® and Fentora® for chronic pain and other non-cancer conditions for

which it was not approved, appropriate, and for which it is not safe. As part of this campaign,

Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales

representatives to give doctors the false impression that Actiq® and Fentora® are safe and

effective for treating non-cancer pain. For example:

a. Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq® and Fentora® for patients with chronic pain.

b. Upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq® and Fentora® for the treatment of non-cancer pain.

c. In December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to thousands

---

[71] *See* U.S. Food & Drug Admin., *Public Health Advisory: Important Information for the Safe Use of Fentora (fentanyl buccal tablets)* (Sept. 26, 2007), https://www.fda.gov/Drugs/DrugSafetyInformationforPatientsandProviders/ucm051273.htm.
[72] *Id.*

of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora® for "multiple causes of pain" – and not just cancer pain.

123. Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq® and Fentora® were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

124. Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin® – the same OxyContin® that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the Los Angeles Times, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report that a Los Angeles clinic prescribed more than 1.1 million OxyContin® tablets and that Purdue's district manager described it internally as "an organized drug ring" until years after law enforcement shut it down. In doing so, Purdue protected its own profits at the expense of public health and safety.[73]

---

[73] Harriet Ryan, et al., *More than 1 Million Oxycontin Pills Ended Up in the Hands of Criminals and Addicts. What the Drug Maker Knew*, L.A. Times, July 10, 2016, http://www.latimes.com/projects/la-me-oxycontin-part2/.

125. Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

### 3. The Manufacturer Defendants Targeted Susceptible Prescribers And Vulnerable Patient Populations

126. As part of their deceptive marketing scheme, the Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the United States. For example, the Manufacturer Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids, and therefore, more likely to accept the Manufacturer Defendants' misrepresentations.

127. The Manufacturer Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. The Manufacturer Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence confirms that elderly patients taking opioids suffer from elevated fall and fracture risks, reduced renal function and medication clearance, and a smaller window between safe and unsafe dosages.[74] The 2016 CDC Guideline concludes that there must be "additional caution and

---

[74] 2016 CDC Guideline, *supra* note 50, at 13.

increased monitoring" to minimize the risks of opioid use in elderly patients. *Id*. at 27.  The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepine) for post-traumatic stress disorder, which interact dangerously with opioids.

### 4. The Manufacturer Defendants Made Materially Deceptive Statements And Concealed Material Facts

128. As alleged herein, the Manufacturer Defendants made and/or disseminated deceptive statements regarding material facts and further concealed material facts, in the course of manufacturing, marketing, and selling prescription opioids.  The Manufacturer Defendants' actions were intentional and/or unlawful.  Such statements include, but are not limited to, those set out below and alleged throughout this Complaint.

129. Defendant Purdue made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

   a. Creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
   b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;
   c. Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through Purdue's own unbranded publications and on internet sites Purdue operated that were marketed to and accessible by consumers;
   d. Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;
   e. Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;
   f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.  Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.  Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in-patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.  Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresenting the risks of opioid addiction;

j.  Endorsing and assisting in the distribution of CME's containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

n.  Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

o.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

p.  Exclusively disseminating misleading statements in education materials to hospitals, doctors, and staff while purportedly educating them on new pain standards;

q.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing; and

r.  Withholding from law enforcement the names of prescribers Purdue believed to be facilitating the diversion of its opioid, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs they knew would reach these same prescribers.

130.  Defendant Endo made and/or disseminated deceptive statements, and concealed

material facts in such a way to make their statements deceptive, including, but not limited to, the

following:

a.  Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.  Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.  Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long-term use for high risk patients;

d.  Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.  Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored and operated;

f.  Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.  Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.  Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in-patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresenting the risks of opioid addiction in this population;

j.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

50

    n. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

131. Defendant Janssen made and/or disseminated deceptive statements and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

    a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

    b. Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

    c. Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

    d. Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

    e. Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

    f. Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

    g. Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in-patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

    h. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresenting the risks of opioid addiction in this population;

    i. Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

    j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

    k. Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of

opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

l.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

m.  Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

n.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribe through in-person detailing.

132.  Defendant Cephalon made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to the following:

a.  Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.  Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

c.  Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

d.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

e.  Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in-patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

f.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

h.  Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

i.  Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

j.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

133.    Defendant Actavis made and/or disseminated deceptive statements and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

    a.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

    b.  Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

    c.  Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

    d.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

**5.    The Manufacturer Defendants Fraudulently Concealed Their Misconduct**

134.    The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive.  The history of opioids, as well as research and clinical experience establish that opioids are highly addictive and are responsible for a long list of very serious adverse outcomes.  The FDA warned Defendants of this, and Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization and death – all of which clearly described the harm from long-term opioid use and that patients were suffering from addiction, overdose, and death in alarming numbers.  More recently, the FDA and CDC have issued pronouncements, based on medical evidence, that conclusively expose the falsity of Defendants' misrepresentations, and Endo and Purdue have recently entered agreements in New

York prohibiting them from making some of the same misrepresentations described in this Complaint.

135.    At all times relevant to this Complaint, the Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct.  For example, the Manufacturer Defendants disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through third-parties like Front Groups and KOLs.  The Manufacturer Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Manufacturer Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain.  Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third-parties.  The Manufacturer Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public.  For example, PainKnowledge.org, which is run by the NIPC, did not disclose Endo's involvement.  Other Manufacturer Defendants, such as Purdue and Janssen, ran similar websites that masked their own role.

136.    Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these documents were accurate, truthful, and supported by objective evidence when they were not.  The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.  The Manufacturer Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community.  The Manufacturer Defendants provided the

54

medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction.  The Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks.  The Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales.

### C. THE DISTRIBUTOR DEDFENDANTS' UNLAWFUL DISTRIBUTION OF OPIOIDS

137.    The Distributor Defendants owe a duty under federal law (21 U.S.C. § 823, 21 CFR 1301.74) to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted.

138.    The foreseeable harm from a breach of these duties is the diversion of prescription opioids for non-medical purposes.

139.    Each Distributor Defendant repeatedly and purposefully breached its duties under state and federal law.  Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for non-medical purposes.

140.    The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity, and mortality.

141.    The Distributor Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid epidemic and causing the damages alleged herein.

1. **The Distributor Defendants Have A Duty Under Federal Law To Guard Against, And Report, Unlawful Diversion And To Report And Prevent Suspicious Orders**

142.   Opioids are a controlled substance.  These "Schedule II" drugs are controlled substances with a "high potential for abuse."  21 U.S.C. §§ 812(b), 812(2)(A)-(C).

143.   Each Distributor Defendant was required to register with the DEA, pursuant to the federal Controlled Substances Act.  *See*  21 U.S. C. § 823(b), (e); 28 C.F.R. § 0.100.  Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme.

144.   Each Distributor Defendant has an affirmative duty under federal law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs.  Federal law requires that distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."  21 U.S.C. § 823(b)(1).

145.   Federal regulations impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant.  Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."  21 C.F.R. § 1301.74(b).

146.   "Suspicious orders" include orders of an unusual size, orders of unusual frequency, or orders deviating substantially from a normal pattern.  *See*  21 C.F.R. §1301.74(b).  These criteria are disjunctive and are not all inclusive.  For example, if an order deviates

substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious.  The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

147.    In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.  *See Southwood Pharm., Inc.,* 72 Fed Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, No. 15-11355 (D.C. Cir. June 30, 2017).  Regardless, all flagged orders must be reported.  *Id.*

148.    These prescription drugs are regulated for the purpose of providing a "closed" system **intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market**, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[75]

---

[75] *See* 1970 U.S.C.C.A.N. 4566, 4571-72.

149.     Different entities supervise the discrete links in the chain that separate a consumer

from a controlled substance.  Statutes and regulations define each participant's role and

responsibilities.[76]

150.     As the DEA advised the Distributor Defendants in a letter to them dated

September 27, 2006, wholesale distributors are "one of the key components of the distribution

chain.  If the closed system is to function properly . . .  distributors must be vigilant in deciding

whether a prospective customer can be trusted to deliver controlled substances only for lawful

purposes.  This responsibility is critical, as . . . the illegal distribution of controlled substances

has a substantial and detrimental effect on the health and general welfare of the American

people."[77]

151.     The Distributor Defendants have admitted that they are responsible for reporting

suspicious orders.[78]

152.     The DEA sent a letter to each of the Distributor Defendants on September 27,

2006, warning that it would use its authority to revoke and suspend registrations when

---

[76] Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 [hereinafter Brief for HDMA and NACDS].  The Healthcare Distribution Management Association (HDMA or HMA) – now known as the Healthcare Distribution Alliance (HDA) – is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others:  AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation.  *See generally* HAD, *About,* https://www.healthcaredistribution.org/about (last visited Aug. 21, 2017).  The National Association of Chain Drug Stores (NACDS) is a national not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others:  Walgreen Company, CVS Health, Rite Aid Corporation, and Walmart.  *See generally* NACDS, *Mission,* https://www.nacds.org/about/mission/ (last visited Aug. 21, 2017).

[77] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) [hereinafter Rannazzisi Letter] ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute controlled substances.  The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."), *filed in Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

[78] *See* Brief for HDMA and NACDS, *supra* note 85, 2016 WL 1321983, at *4("[R]egulations . . . in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders).").

appropriate.  The letter expressly states that a distributor, ***in addition*** to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[79] The Letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes."[80]  The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."

153.    The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[81] This letter reminds the Defendants of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[82] The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders <u>when discovered</u> by the registrant. Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders.  Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report.  Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.

> The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from normal pattern, and orders of an unusual frequency.  These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should

---

[79] Rannazzisi Letter, *supra* note 83, at 2.
[80] *Id*. at 1.
[81] *Id*. at 2.
[82] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health v. Holder*, No. 1:12—cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.

be reported as suspicious.  Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious.  The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the segment of the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders.  For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient.  This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor.  Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially.  Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious.  Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion.  Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 U.S.C. §§ 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.[83]

Finally, the DEA letter references the Revocation of Registration issued in *Southwood*

*Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to

---

[83] *Id.*

report suspicious orders and "some criteria to use when determining whether an order is suspicious."[84]

154.    The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."[85]

155.    The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders.  Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."  The guidelines set forth recommended steps in the "due diligence" process, and note in particular:  If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.[86]

156.    Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers from which Defendants knew prescription opioids were likely to be diverted.

---

[84] *Id.*
[85] *See* Brief of HDMA, *supra* note 19, 2012 WL 1637016, at *2.
[86] Healthcare Distribution Management Association (HDMA) *Industry Compliance Guidelines:  Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in Cardinal Health v. Holder,* No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

157.    Each Distributor Defendant owes a duty to monitor and detect suspicious orders of prescription opioids.

158.    Each Distributor Defendant owes a duty under federal law to investigate and refuse suspicious orders of prescription opioids.

159.    Each Distributor Defendant owes a duty under federal law to report suspicious orders of prescription opioids.

160.    Each Distributor Defendant owes a duty under federal law to prevent the diversion of prescription opioids into illicit markets throughout the United States.

161.    The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

162.    The foreseeable harm resulting from the diversion of prescription opioids for non-medical purposes is abuse, addiction, morbidity, and mortality and the damages caused thereby.

**2.    The Distributor Defendants Breached Their Duties**

163.    Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances.  Should a distributor deviate from these checks and balances, the closed system collapses.[87]

164.    The sheer volume of prescription opioids distributed to pharmacies in various areas, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted, was excessive for the medical need of the community and facially suspicious.

---

[87] *See* Rannazzisi Decl. ¶ 10, filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv00185-RBW (D.D.C. Feb. 10, 20122), ECF No 14-2.

Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[88]

165.    The Distributor Defendants failed to report "suspicious orders," or orders which the Distributor Defendants knew were likely to be diverted, to the federal authorities, including the DEA.

166.    The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted.

167.    The Distributor Defendants breached their duty to monitor, detect, investigate, refuse, and report suspicious orders of prescription opiates, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted.

168.    The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

169.    The Distributor Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities, including the DEA, of suspicious orders when discovered, in violation of their duties under federal law.

170.    The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific, and industrial channels.[89]

---

[88] *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 4195*, 77 Fed. Reg. 62,316, 62,322 (2012)).
[89] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

171.    The federal laws at issue here are public safety laws.

172.    The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under State law.

173.    The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor Defendants refuse to abide by the duties imposed by federal law which are required to legally acquire and maintain a license to distribute prescription opiates.

174.    The Distributor Defendants acted with actual malice in breaching their duties, *i.e.*, they have acted with a conscious disregard for the rights and safety of other persons, and said actions have great probability of causing substantial harm.

175.    The Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

### 3.    The Distributor Defendants Have Sought To Avoid And Have Misrepresented Their Compliance With Their Legal Duties

176.    The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

177.    Distributor Defendants have refused to recognize any duty beyond *reporting* suspicious orders.  In *Masters Pharmaceuticals*, the HDMA, a trade association run by the Distributor Defendants, and the NACDS submitted amicus briefs regarding the legal duty of

wholesale distributors.  Inaccurately denying the legal duties that the wholesale drug industry has been tragically recalcitrant in performing, they argued as follows:

a.  The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to *investigate* orders (e.g., by interrogating pharmacies and physicians) and take action to *halt* suspicious orders before they are filled."[90]

b.  The Associations argued that, "DEA now appears to have changed its position to require that distributors not only *report* suspicious orders, but *investigate* and *halt* suspicious orders.  Such a change in agency position must be accompanied by an acknowledgment of the change and a reasoned explanation for it.  In other words, an agency must display awareness that it *is* changing position and show that there are good reasons for the new policy.  This is especially important here, because imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications."[91]

c.  The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious."[92]

d.  The Associations complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that the DEA has complied with the APA before attempting to impose such duties."[93]

e.  The Associations alleged (inaccurately) that "DEA's regulations [] sensibly impose[] a duty on distributors simply to *report* suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders."[94]

f.  Also inaccurately, the Associations argued that, "[i]mposing a duty on distributors – which lacks the patient information and the necessary medical expertise – to investigate and halt orders may force distributors to take a shot-in-the-dark approach to complying with DEA's demands."[95]

178.  The positions taken by the trade groups is emblematic of the position taken by the Distributor Defendants in a futile attempt to deny their legal obligations to prevent diversion of the dangerous drugs.[96]

---

[90] Brief for HDMA and NACDS, *supra* note 85, 2016 WL 1321983, at *4-5.
[91] *Id*. at *8 (citations and quotation marks omitted).
[92] *Id*. at *14.
[93] *Id*. at *22.
[94] *Id*. at *24-25.
[95] *Id*. at 26.
[96] *See* Brief for HDMA, *supra* note 19, 2012 WL 1637016, at *3 (arguing the wholesale distributor industry "does not know the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

179.    The Court of Appeals for the District of Columbia recently issued its opinion

affirming that a wholesale drug distributor does, in fact, have duties beyond reporting.  *Masters*

*Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017).  The D.C. Circuit Court

upheld revocation of Master Pharmaceutical's license and determined that DEA regulations

require that in addition to reporting suspicious orders, distributors must "decline to ship the

order, or conduct some 'due diligence' and – if it is able to determine that the order is not likely

to be diverted into illegal channels – ship the order."  *Id.* at 212.  Master Pharmaceutical was in

violation of legal requirements because it failed to conduct necessary investigations and filled

suspicious orders.  *Id*. at 218-19.

180.    A distributor's investigation must dispel all the red flags giving rise to suspicious

circumstance prior to shipping a suspicious order.  *Id*. at 226.  The Circuit Court also rejected the

argument made by the HDMA and NACDS (quoted above), that, allegedly, the DEA had created

or imposed new duties.  *Id*. at 220.

181.    Wholesale Distributor McKesson has recently been forced to specifically admit to

breach of its duties to monitor, report, and prevent suspicious orders.  Pursuant to an

Administrative Memorandum of Agreement ("2017 Agreement") entered into

between McKesson and the DEA in January 2017, McKesson admitted that, at various times

during the period from January 1, 2009 through the effective date of the Agreement (January 17,

2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies

which should have been detected by McKesson as suspicious based on the guidance contained in

the DEA Letters."[97]  Further, the 2017 Agreement specifically finds that McKesson "distributed

controlled substances to pharmacies even though those McKesson Distribution Centers should

---

[97] *See* Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), https://www.justice.gov/opa/press-release/file/ 928476/ download.

have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R. § 1306.04(a)."[98] McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 *et seq.*, at the McKesson Distribution Centers.

182.    The 2017 Agreement followed a 2008 Settlement Agreement in which McKesson also admitted failure to report suspicious orders of controlled substances to the DEA.[99] In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to the DEA," but had failed to do so.[100] The 2017 Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to the DEA, in accordance with McKesson's obligations.[101] As a result of these violations, McKesson was fined and required to pay to the United States $150,000,000.[102]

183.    Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those

---

[98] *Id*. at 4.

[99] *Id*. at 4.

[100] *Id*.

[101] *Id*.; *see also* Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter 2017 Settlement Agreement and Release] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), https://www.justice.gov/opa/press-release/file/928471/download.

[102] *See* 2017 Settlement Agreement and Release, *supra* note 112, at 6.

obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

184. Because of the Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.[103] The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[104] These actions include the following:

    a. On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

    b. On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington distribution center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

    c. On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida distribution center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

    d. On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey distribution center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

    e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas distribution center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

---

[103] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), http://oig.justice.gov/reports/2014/e1403.pdf.
[104] *Id.*

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreements* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an *Order of Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida distribution center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida distribution center; and

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora, Colorado; Aurora, Illinois; Delran, New Jersey; LaCrosse, Wisconsin; Lakeland, Florida; Landover, Maryland; La Vista, Nebraska; Livonia, Michigan; Methuen, Massachusetts; Sante Fe Springs, California; Washington Courthouse, Ohio and West Sacramento, California.

185. Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively, through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's

license from "imminent harm" to "immediate harm" and provided the industry the right to "cure"

any violations of law before a suspension order can be issued.[105]

186.    In addition to taking actions to limit regulatory prosecutions and suspensions, the

Distributor Defendants undertook to fraudulently convince the public that they were complying

with their legal obligations, including those imposed by licensing regulations.  Through such

statements, the Distributor Defendants attempted to assure the public they were working to curb

the opioid epidemic.

187.    For example, a Cardinal Health executive claimed that it uses "advanced

analytics" to monitor its supply chain, and represented that it was being "as effective and

efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal

activity."[106] Given the sales volumes and the company's history of violations, this executive was

either not telling the truth, or, if Cardinal Health had such a system, it ignored the results.

188.    Similarly, Defendant McKesson publicly stated that it has a "best-in-class

controlled substance monitoring program to help identify suspicious orders," and claimed it is

"deeply passionate about curbing the opioid epidemic in our country."[107] Again, given

---

[105] *See* Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investiagion-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-ble9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://wvgazettemail.com/news/20170218/dea-agent-we-haad-no-leadership-in-wf-amid-flood-of-pain-pills-.
[106] Lenny Bernstein, et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.
[107] [107] Scott Higham, et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

189.    By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert.

190.    Meanwhile, the opioid epidemic rages unabated in the United States.

191.    The epidemic still rages because the fines and suspensions imposed by the DEA do not change the conduct of the industry.  The distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue.  They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

192.    The wrongful actions and omissions of the Distributor Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiffs' racketeering allegations below.

193.    The Distributor Defendants have abandoned their duties imposed under federal law, taken advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances.

### D.    THE MANUFACTURER DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT, AND PREVENT SUSPICIOUS ORDERS

194.    The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids that were incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under federal law.

71

195.    Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture Schedule II controlled substances, like prescription opioids.  *See* 21 U.S.C. § 823(a).  A requirement of such registration is the:

> maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific, research and industrial purposes . . ..

21 USCA § 823(a)(1).

196.    Additionally, as "registrants" under Section 823, the Manufacturer Defendants were also required to monitor, report, and prevent suspicious orders of controlled substances:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant.  Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74. *See also* 21 C.F.R. § 1301.02 ("Any term used in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter.") 21 C.F.R. § 1300.01 ("Registrant means any person who is registered pursuant to either section 303 or section 1008 of the Act (21 U.S.C. 823 or 958.))"  Like the Distributor Defendants, the Manufacturer Defendants breached these duties.

197.    The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the

manufacturer's product at a price below a specified rate.  After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume, and the pharmacy to which it sold the product.  Thus, the Manufacturer Defendants knew – just as the Distributor Defendants knew – the volume, frequency, and pattern of opioid orders being placed and filled.  The Manufacturer Defendants built receipt of this information into the payment structure for the opioid provided to the opioid distributors.

198.    Federal statutes and regulations are clear: just like opioid distributors, opioid manufacturers are required to "design and operate a system to disclose . . . suspicious orders of controlled substances: and to maintain "effective controls against diversion."  21 C.F.R. § 1301.74; 21 USCA § 823(a)(1).

199.    The Department of Justice has recently confirmed the suspicious order obligations clearly imposed by federal law upon opioid manufacturers, fining Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating record keeping requirements.[108]

200.    In the press release accompanying the settlement, the Department of Justice stated: Mallinckrodt did not meet its obligations to detect and notify the DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic.  These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone. . .Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . .

---

[108] See Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Record Keeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.

. "Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands. . . ."[109]

201.    Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances – orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying the DEA of these suspicious orders."[110]

202.    The Memorandum of Agreement ("2017 Mallinckrodt MOA") entered into by Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to the DEA."[111]

203.    The 2017 Mallinckrodt MOA further details the DEA's allegations regarding Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer:

> With respect to its distribution of oxycodone and hydrocodone products, Mallinckrodt's alleged failure to distribute these controlled substances in a manner authorized by its registration and Mallinckrodt's alleged failure to operate an effective suspicious order monitoring system and to report suspicious orders to the DEA when discovered as required by and in violation of 21 C.F.R. § 1301.74(b).  The above includes, but is not limited to Mallinckrodt's alleged failure to:
>
> i.    conduct adequate due diligence of its customers;
> ii.   detect and report to the DEA orders of unusual size and frequency;
> iii.  detect and report to the DEA orders deviating substantially from normal patterns including, but not limited to, those identified in letters from the DEA Deputy Assistant Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007;

---

[109] *Id.*

[110] *Id.*

[111] Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary, Mallinckrodt, LLC (July 10, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download.

1. orders that resulted in a disproportionate amount of a substance which is most often abused going to a particular geographic region where there was known diversion,
2. orders that purchased a disproportionate amount of substance which is most often abused compared to other products, and
3. orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;

iv. use "chargeback" information from its distributors to evaluate suspicious orders.  Chargebacks include downstream purchasing information tied to certain discounts, providing Mallinckrodt with data on buying patterns for Mallinckrodt products; and

v. take sufficient action to prevent recurrence of diversion by downstream customers after receiving concrete information of diversion of Mallinckrodt product by those downstream customers.[112]

204. Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."  Mallinckrodt further agreed that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and would "design and operate a system that meets the requirements of 21 C.F.R. 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product.  Further, Mallinckrodt agreed to notify the DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."[113]

205. Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors).  The transaction information contains data relating to the direct customer sales of

---

[112] 2017 Mallinckrodt MOA at 203.
[113] *Id*. at 3-4.

controlled substances to 'downstream' registrants."  Mallinckrodt agreed that, from this data, it would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[114]

206.    The same duties imposed by federal law on Mallinckrodt were imposed upon all Manufacturer Defendants.

207.    The same business practices utilized by Mallinckrodt regarding "chargebacks" and receipt and review of data from opioid distributors regarding orders of opioids were utilized industry-wide among opioid manufacturers and distributors, including, upon information and belief, the other Manufacturer Defendants.

208.    Through, *inter alia*, the chargeback data, the Manufacturer Defendants could monitor suspicious orders of opioids.

209.    The Manufacturer Defendants failed to monitor, report, and halt suspicious orders of opioids as required by federal law.

210.    The Manufacturer Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

211.    The Manufacturer Defendants have misrepresented their compliance with federal law.

212.    The wrongful actions and omissions of the Manufacturer Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiffs' racketeering allegations below.

---

[114] *Id*. at 5.

213. The Manufacturer Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids throughout the United States.

### E. DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM ALLEGED HEREIN AND SUBSTANTIAL DAMAGES

214. As the Manufacturer Defendants' efforts to expand the market for opioids increased so have the rates of prescriptions and sale of their products – and the rates of opioid-related substance abuse, hospitalization, in-patient addiction treatment, and death among the people of the United States. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids.

215. There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[115]

216. Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[116]

217. The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[117]

218. The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths.[118]

---

[115] *See* Dart et al., *supra* note 11.
[116] *See* Volkow & McLellan, *supra* note 1.
[117] *See* Califf et al., *supra* note 3.
[118] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *supra* note 13.

219.     As shown above, the opioid epidemic has escalated with devastating effects: substantial opiate-related substance abuse, hospitalization, in-patient addiction treatment, and death that mirrors Defendants' increased distribution of opioids.

220.     Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, like heroin, the massive distribution of opioids by Defendants has caused the Defendant-caused opioid epidemic to include heroin addiction, abuse, and death.

221.     Defendants repeatedly and purposefully breached their duties under federal law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes.

222.     The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity, and mortality in the United States.  This diversion and the epidemic are direct causes of foreseeable harms to the Plaintiffs and the members of the proposed Class.

223.     Defendants' unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Plaintiffs seek relief, as alleged herein, on behalf of themselves and the members of the proposed Class.

## V.      FACTS PERTAINING TO THE NAMED PLAINTIFFS AND CLASS MEMBERS

224.     Plaintiffs and the Class Members have treated, and continue to treat, numerous patients for opioid-related conditions, specifically: (1) opioid overdose; (2) opioid addiction; and (3) psychiatric and related treatment for opioid users who are committed to mental health and addiction treatment programs.

225.    Additionally, opioid users present themselves to Plaintiffs and the Class Members claiming to have illnesses and medical problems, which are actually pretexts for obtaining opioids to satisfy their cravings.  Plaintiffs and the Class Members incur operational costs consisting of expending time and incurring expenses in diagnosing, testing, and otherwise dealing with these "pill seekers" before their true status can be determined and they can be treated for their addictions.  Plaintiffs and the Class Members incur operational costs consisting of expending time and incurring expenses in the addition treatment for patients seeking recovery.

226.    Collectively, the patients described above will be referred to herein as "patients with opioid conditions."

227.    These patients' opioid conditions are the direct and proximate result of the opioid epidemic created and engineered by Defendants.

228.    Plaintiffs and the Class Members each have a price list, which sets the prices for a comprehensive listing of items billable to a treatment facility patient, the patient's health insurance provider, or, otherwise, billable items paid through donations.

229.    These are full charges for the facilities' services.  The full charges are only partially reimbursed by patients, private health insurers, or through donations, if at all.  Most treatment facilities require patients to pay out of pocket and do not have agreements with health insurance companies.  Some Plaintiffs and the Class Members have provider agreements with private health insurers whereby they accept payment from the health insurers at a discounted rate on behalf of insured patients.  The difference between the full charges and the discounted rate is lost to the treatment facilities.  Medicare and Medicaid do not typically cover addiction treatment.

230.    Plaintiffs and the Class Members bill their full charges to uninsured patients. Typically, where there is no health insurance, these charges are typically not reimbursed nor covered by donations and are lost to the treatment facilities.

231.    Plaintiffs and the Class Members incur partial or total monetary losses for uninsured patients, patients with health insurance, and/or a lack of donations in the treatment of patients with opioid conditions.  These patients would not have presented to Plaintiffs and the Class Members, and would not have had opioid conditions, but for the opioid epidemic created and engineered by Defendants.  Accordingly, Plaintiffs' and the Class Members' aforesaid monetary losses are the direct and proximate result of Defendants' acts and omissions previously specified herein.

232.    Because opioids are very dangerous and highly addictive drugs, it was foreseeable to Defendants that the opioid epidemic would result in a corresponding epidemic of patients with opioid conditions at treatment facilities.  It was also foreseeable to Defendants that Plaintiffs and the Class Members would suffer the aforesaid monetary losses because of the opioid epidemic since treatment facilities typically are not reimbursed for their treatment of uninsured patients and receive only partial reimbursement for their treatment of patients from patients, the patients' health insurance, if the facility has insurance agreements, or donations.

## VI.    CLASS ACTION ALLEGATIONS

233.    This action is brought as a plaintiffs' class action pursuant to Federal Rule of Civil Procedure 23(b)(3).  Plaintiffs bring this action on their own behalf, and on behalf of all others similarly situated, as representatives of the following Class:

> All treatment facilities, for profit and not for profit, in the United States which treated patients with opioid conditions, (1) for four years preceding the commencement of this action with respect to Plaintiffs' RICO claims, and (2) for six years preceding the commencement of this action with

respect to Plaintiffs' state-law claims.  "Patients with opioid conditions" are defined as patients with opioid overdose; patients with opioid addiction; opioid users committed to mental health treatment programs; and opioid users with pretextual excuses for obtaining opioids.

Excluded from the Class are any facilities directly or indirectly owned or operated by Defendants or Defendants' affiliated entities.

234.    The Members of the Class are readily identifiable from public records.

235.    Upon information and belief, the Class consists of thousands of Members, and is therefore so numerous that individual joinder of all Members is impracticable.  The Members of the Class are geographically dispersed throughout the United States.

236.    There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Members of the Class.  The wrongs suffered and remedies sought by Plaintiffs and the other Members of the Class are premised upon a uniform unlawful scheme perpetuated by Defendants.  The sole question affecting only individual Members of the Class is the exact monetary recovery to which each Class Member is entitled. Cost per patient of treatment should be a simple determination to make.  Questions common to the Class include, but are not limited to, the following:

      a.  Did the Manufacturer Defendants use false and deceptive statements and omissions to market opioids?

      b.  Did the Manufacturer Defendants market opioids by misrepresenting the risks and benefits of opioids?

      c.  Did the Manufacturer Defendants and the Distributor Defendants fail to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids?

      d.  Did the Manufacturer Defendants and the Distributor Defendants fail to monitor, detect, investigate, refuse to fill, and report orders of prescription opioids which they knew or should have known were likely to be diverted for nonmedical purposes?

      e.  Did the Defendants conduct the affairs of an enterprise through a pattern of racketeering activity?

      f.  Did the Defendants conspire to conduct the affairs of an enterprise through a pattern of racketeering activity?

g.  Did the Manufacturer Defendants negligently manufacture, market, and sell opioids?

h.  Did the Distributor Defendants negligently sell and distribute opioids?

i.  Did the Manufacturer Defendants wantonly, recklessly, or with gross negligence manufacture, market, and sell opioids?

j.  Did the Distributor Defendants wantonly, recklessly, or with gross negligence sell and distribute opioids?

k.  Did the Defendants commit common-law fraud by making false representations of material fact and by concealing material facts about opioids?

l.  Were Plaintiffs and the Class Members monetarily damaged as a direct and proximate result of the Defendants' acts and omissions?

237.  Plaintiffs' claims are typical of those of the Class, and are based on the same legal theories as those of the Class Members.  Plaintiffs' claims, and those of the Class Members, all arise from the same pattern or practice by the Defendants, set out above.

238.  Plaintiffs will fairly and adequately protect the interests of the Members of the Class.  Plaintiffs have retained counsel who are highly experienced and competent in complex consumer class-action litigation, and Plaintiffs and their counsel intend to prosecute this action vigorously.  Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action.  Plaintiffs' interests are coextensive with those of the Class, and Plaintiffs have no interests adverse to those of the Class Members.

239.  Plaintiffs have made arrangements with their counsel for the discharge of their financial responsibilities to the Class.  Plaintiffs' counsel has the necessary financial resources to adequately and vigorously litigate this class action.

240.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  It is desirable to concentrate the litigation of the claims in this forum, because the damages suffered by the individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.  Moreover, the individual Class Members are unlikely to be aware of

their rights.  Thus, it is unlikely that the Class members, on an individual basis, can obtain effective redress for the wrongs done to them.  Additionally, the court system would be adversely affected by such individualized litigation.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase delay and expense to all parties and the court system from the issues raised by this action.  In contrast, the class-action device provides the benefit of adjudication of these issues in a single proceeding, with economics of scale and comprehensive supervision by a single court.

241.    Plaintiffs and their counsel are aware of no litigation concerning the controversy already begun by or against Class Members.  This also indicates that the Class Members' interest in individually controlling the prosecution of separate actions is minimal.

## VII.  CAUSES OF ACTION

### A.    COUNT I

### PUBLIC NUISANCE
**(Against All Defendants)**

242.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

243.    This action is brought by the Plaintiffs to abate the public nuisance created by the Defendants.

244.    Defendants, individually and in concert with each other, have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of the Plaintiffs and/or Class Members, and the general public, or interferes with the comfortable enjoyment of life in violation of Mississippi common law.

245.    The public nuisance created by Defendants' actions is substantial and
unreasonable – it has caused and continues to cause significant harm to the community and the
harm inflicted outweighs any offsetting benefit.  The staggering rates of opioid use resulting
from Defendants' marketing efforts have caused harm to the community that includes, but is not
limited to:

    a. Upwards of 30% of all adults have used them.  These high rates of use have led
to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

    b. Children, too, have been harmed by opioids.  They have been exposed to
medications prescribed to family members or others, resulting in injury,
addiction, and death.  Easy access to prescription opioids has made opioids a
recreational drug of choice among teenagers; opioid use among teenagers is
only outpaced by marijuana use.  Even infants have been born addicted to
opioids due to prenatal exposure, causing severe withdrawal symptoms and
lasting developmental impacts.

    c. Individuals who have never taken opioids also have suffered the costs of
Defendants' public nuisance.  Many have endured both the emotional and
financial costs of caring for loved ones addicted to or injured by opioids, and
the loss of companionship, wages, or other support from family members who
have used, abused, become addicted to, overdosed on, or been killed by
opioids.

    d. More broadly, opioid use and misuse have driven health care costs higher.

    e. Employers have lost the value of productive and healthy employees who
suffered from adverse consequences from opioid use.

    f. Defendants' success in extending the market for opioids to new patients and
chronic conditions has also created an abundance of drugs available for
criminal use and fueled a new wave of addiction, abuse, and injury.
Defendants' scheme created both ends of a new secondary market for opioids –
providing both the supply of narcotics to sell and the demand of addicts to buy
them.

    g. This demand also has created additional illicit markets in other opiates,
particularly heroin.  The low cost of heroin has led some of those who initially
become addicted to prescription opioids to migrate to cheaper heroin, fueling a
new heroin epidemic in the process.

    h. The diversion of opioids into the secondary, criminal market and the increase
in number of individuals who abuse or are addicted to opioids has increased the
demands on treatment facilities, including the Plaintiffs.

    i. All of this has caused significant harm to the community – in lives lost;
addictions endured; the creation of an illicit drug market and all its
concomitant crime and costs; unrealized economic productivity; and broken
families and homes.

    j.   These harms have taxed human, public health, law enforcement, treatment facilities, and financial resources of the public.

    k.   Defendants' interference with the comfortable enjoyment of life of a substantial number of people is entirely unreasonable because there is little social utility to opioid use and any potential value is outweighed by the gravity of the harm inflicted by the Defendants' actions.

    l.   Plaintiffs and all treatment facilities are left to bear the costs and burdens of this public nuisance created by the Defendants' actions.

246.    Defendants knew or should have known that their promotion of opioid use would create a public nuisance.

    a.   Defendants have engaged in massive production, promotion, and distribution of opioids for use by individuals.

    b.   Defendants' actions created and expanded the market for opioids, promoting its wide use for pain management.

    c.   Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs.

    d.   Defendants knew or should have known that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

247.    Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used.  Defendants' actions were, at the least, a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain.  Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

248.    The health and safety of all citizens, including those who use, have used, or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to all citizens.

249.    The public nuisance created, perpetuated, and maintained by Defendants can be abated and further reoccurrence of such harm and inconvenience can be prevented.

250.     Defendants' conduct has affected and continues to affect a considerable number of people and is likely to continue to cause significant harm to chronic pain patients who take opioids, their families, and the community at large.

251.     Each Defendant created or assisted in the creation of the epidemic of opioid use and injury, and each Defendant is jointly and severally liable for abating it.

**B.     COUNT II**

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
**18 U.S.C. 1961, *et seq*.**
**(Against All Defendants)**

252.     Plaintiffs reallege and incorporate by reference all preceding paragraphs, and allege as follows on behalf of themselves and the proposed Class:

253.     Plaintiffs bring this Count against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

254.     The RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact-enterprise and/or a legal entity enterprise.  At all relevant times, the RICO Defendants were "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

255.     Section 1962(c) of RICO makes is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c); *United States v. Turkette*, 452 U.S. 576, 580 (1981).

256.    The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); *Turkette*, 452 U.S. at 580; *Boyle v. U.S.*, 556 U.S. 938, 944 (2009).  The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within its scope.  Specifically, the Section "describes two separate categories of associations that come within the purview of an 'enterprise' – the first encompassing organizations such as corporations, partnerships, and other 'legal entities,' and the second covering 'any union or group of individuals associated in fact although not a legal entity.'"  *Turkette*, 452 U.S. at 577.  The second category is not a more generalized description of the first.  *Id*.

257.    For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold.  However, the RICO Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers.  As "registrants," the RICO Defendants operated and continue to operate within the "closed-system" created under the Controlled Substances Act, 21 U.S.C. § 821, *et seq*. (the "CSA").  The CSA restricts the RICO Defendants' ability to manufacture or distribute Schedule II substances like opioids by requiring them to: (1) register to manufacture or distribute opioids; (2) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; (3) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA; and (4) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

258.    The closed-system created by the CSA, including the establishment of quotas, was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from "legitimate channels of trade" to the illicit market "by controlling the 'quantities of the basic ingredients needed for the manufacture of [controlled substances].'"[119]

259.    Finding it impossible to legally achieve their ever increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders.[120]  As discussed in detail below, through RICO Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers which, in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA.[121]  In doing so, the RICO Defendants allowed hundreds of millions of pills to enter the illicit market which allowed them to generate obscene profits.

260.    Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants, and executed in perfect harmony by each of them.  In particular, each of the RICO Defendants were associated with, and conducted or participated in, the affairs of the RICO enterprise (defined below and referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids and deceive the public and federal and state regulators into believing that the

---

[119] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/rannazzisi%20Testimony_0.pdf).
[120] 21 U.S.C. § 823(a)(1), (b)(1); 21 C.F.R. § 1301.74(b)-(c).
[121] 21 C.F.R. § 1303.11(b); 21 C.F.R. § 1303.23.

RICO Defendants were faithfully fulfilling their statutory obligations.  The RICO Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share.  As a direct result of the RICO Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities, like the Plaintiffs, experienced tens of millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.  As explained in detail below, the RICO Defendants' misconduct violated Section 1962(c) and Plaintiffs are entitled to treble damages for their injuries under 18 U.S.C. § 1964(c).

261.    Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States.  Specifically, the Healthcare Distribution Alliance, (the "HDA")[122] is a distinct legal entity that satisfies the definition of a RICO enterprise.  The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia.  As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in 18 U.S.C. § 1961(4) because it is a corporation and a legal entity.

262.    On information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion

---

[122] Health Distribution Alliance, Health Distribution Alliance, (last accessed on September 15, 2017), https://www.healthcaredistribution.org/about/hda-history.

Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

263.     Each of the RICO Defendants is a legal entity separate and distinct from the HDA.  And, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants.  Therefore, the HDA exists separately from the Opioid Diversion Enterprise and each of the RICO Defendants exists separately from the HDA.  Accordingly, the HDA may serve as a RICO enterprise.

264.     The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity.  Hence, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

### The Opioid Diversion Enterprise

265.     Recognizing that there is a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.[123] The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.[124]  Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.[125]  As reflected in comments from United States Senators during deliberation on the CSA, the "[CSA] is designed to crack down hard on the narcotics pusher and the illegal diverters of pep pills and goof

---

[123] Joseph T. Rannazzisi Decl. ¶ 4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General,* D.D.C. Case No. 21-cv-185 (Document 14-2 February 10, 2012).
[124] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566.
[125] *Gonzalez v. Raich*, 545 U.S. 1, 12-14 (2005); 21 U.S.C. § 801 (20); 21 U.S.C. §§ 821-824, 827, 880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970).

balls."[126]  Congress was concerned with the diversion of drugs out of legitimate channels of

distribution when it enacted the CSA and acted to halt the "widespread diversion of [controlled

substances] out of legitimate channels into the illegal market."[127]  Moreover, the closed-system

was specifically designed to ensure that there are multiple ways of identifying and preventing

diversion through active participation by registrants within the drug delivery chain.[128]  All

registrants – manufacturers and distributors alike – must adhere to the specific security,

recordkeeping, monitoring and reporting requirements that are designed to identify or prevent

diversion.[129]  When registrants at any level fail to fulfill their obligations, the necessary checks

and balances collapse.[130]  The result is the scourge of addiction that has occurred.

266.    In 2006 and 2007, the DEA issued multiple letters to the Distributor Defendants

reminding them of their obligation to maintain effective controls against diversion of particular

controlled substances, design and operate a system to disclose suspicious orders, and to inform

the DEA of any suspicious orders.[131]  The DEA also published suggested questions that a

distributor should ask prior to shipping controlled substances, in order to "know their

customers."[132]

---

[126] See H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 116 Cong. Rec. 977078 (Comments of Sen. Dodd, Jan. 23, 1970).
[127] See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).
[128] See Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, July 18, 2012 (available at https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/07/18/12/07-18-12-dea-rannazzisi.pdf).
[129] Id.
[130] Joseph T. Rannazzisi Decl. ¶ 10, Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).
[131] Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (September 27, 2006); Joseph T. Rannazzisi, In Reference to Registration # RCo183080 (December 27, 2007).
[132] Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf).

267.     Central to the closed-system created by the CSA was the directive that the DEA

determine quotas of each basic class of Schedule I and II controlled substances each year.  The

quota system was intended to reduce or eliminate diversion from "legitimate channels of trade"

by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled

substances], and the requirement of order forms for all transfers of these drugs."[133]  When

evaluating production quotas, the DEA was instructed to consider the following information:

a.   information provided by the Department of Health and Human Services;
b.   total net disposal of the basic class by all manufacturers;
c.   trends in the national rate of disposal of the basic class;
d.   an applicant's production cycle and current inventory position;
e.   total actual or estimated inventories of the class and of all substances
     manufactured from the class and trends in inventory accumulation; and
f.   other factors such as: changes in the currently accepted medical use of
     substances manufactured for basic class; the economic and physical
     availability of raw materials; yield and sustainability issues; potential
     disruptions to production; and unforeseen emergencies.[134]

268.     It is unlawful for a registrant to manufacture a controlled substance in Schedule II,

like prescription opioids, that is (1) not expressly authorized by its registration and by a quota

assigned to it by the DEA, or (2) in excess of a quota assigned to it by the DEA.[135]

269.     At all relevant times, the RICO Defendants operated as an association-in-fact

enterprise formed for the purpose of unlawfully increasing sales, revenues, and profits by

disregarding their statutory duty to identify, investigate, halt, and report suspicious orders of

opioids and diversion of their drugs into the illicit market in order to unlawfully increase the

quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a

---

[133] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/rannazzisi%20testimony_0.pdf).
[134] *See* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/rannazzisi%20testimony_0.pdf).
[135] *Id.* (citing 21 U.S.C. 824(b)).

greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.

270. The opioid epidemic has its origins in the mid-1900s when, between 1997 and 2007, per capita purchase of methadone, hydrocodone, and oxycodone increased 13-fold, 4-fold, and 9-fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the country with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[136] On information and belief, the Opioid Diversion Enterprise has been ongoing for at least the last decade.[137]

271. The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since is genesis. But, it was not until recently that the United States and State regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public.

272. At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. *Turkette*, 452 U.S. at 580; *Boyle*, 556 U.S. at 944 (2009). Each member of the Opioid Diversion

---

[136] Keyes KM, Cerda M, Brady JE, Havens JR, Galea S. *Understanding the rural-urban differences in nonmedical prescription opioid use and abuse in the United States.* Am J Public Health. 2014; 104(2):352-9.

[137] Matthew Perrone, Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the RICO Defendants would have a larger pool of prescription opioids from which to profit.

273.    The Opioid Diversion Enterprise also engaged in efforts to lobby against the DEA's authority to hold the RICO Defendants liable for disregarding their duty to prevent diversion. Members of the Pain Care Forum (described in greater detail below) and the Healthcare Distribution Alliance lobbied for the passage of legislation to weaken the DEA's enforcement authority. The Ensuring Patient Access and Effective Drug Enforcement Act significantly reduced the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations.[138] The HDA and other members of the Pain Care Forum contributed substantial amounts of money to political campaigns for federal candidates, state candidates, political action committees, and political parties. Plaintiffs are informed and believe that the Pain Care Forum and their members poured at least $3.5 million into lobbying efforts in this jurisdiction while the HDA devoted over a million dollars a year to its lobbying efforts between 2011 and 2016.

---

[138] *See* <u>HDMA is now the Healthcare Distribution Alliance, Pharmaceutical Commerce,</u> (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Octo. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/584ee60-028b-11e7-ble9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

274.     The Opioid Diversion Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity, that involves a fraudulent scheme to increase revenue by violating state and federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market.  The goal of Defendants' scheme was to increase profits from opioid sales.  But, Defendants' profits were limited by the production quotas set by the DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market.  The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

275.     The Opioid Diversion Enterprise engaged in and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across state lines, such as manufacture, sale, distribution, and shipment of prescription opioids throughout the Country and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

276.     Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis.  These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise.  The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

277.    Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities.  The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in and are members of the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

278.  the RICO Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

279.    The Pain Care Forum ("PCF") has been described as a coalition of drug makers, trade groups, and dozens of non-profit organizations supported by industry funding.  The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

280.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[139]  Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[140]

---

[139] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-ech-chamber-shaped-policy-amid-drug-epidemic (emphasis added).
[140] Id.

281.    Not surprisingly, each of the RICO Defendants who stood to profit from lobbying in favor of the prescription opioid use is a member of and/or participant in the PCF.[141]  In 2012, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company of Janssen Pharmaceuticals), Actavis (*i.e.*, Allergan), and Teva (the parent company of Cephalon).[142]  Each of the Manufacturer Defendants worked together through the PCF to advance interests of the enterprise.  But, the Manufacturer Defendants were not alone.  The Distributor Defendants actively participated and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[143]  Plaintiffs are informed and believe that the Distributor Defendants participated directly in the PCF as well.

282.    The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on the subject of the Defendants' interpersonal relationships.  The meeting schedule indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless otherwise noted.  Local members were "encouraged to attend in person" at the monthly meetings.  And, the meeting schedule indicates that the quarterly and year-end meetings included a "Guest Speaker."

283.    The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drug makers and their allies, whose sole purpose was to shape the

---

[141] PAIN CARE FORUM 2012 Meetings Schedule, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf.
[142] *Id*. Plaintiffs are informed and believe that Mallinckrodt became an active member of the PCF sometime after 2012.
[143] *Id*. The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation.  Executive Committee, Healthcare Distribution Alliance (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/executive-committee.

national response to the ongoing prescription opioid epidemic, including concerted lobbying efforts that the PCF undertook on behalf of its members.

284.    Second, the HDA – or Healthcare Distribution Alliance – led to the formation of interpersonal relationships and an organization between the RICO Defendants.  Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the complaint, including Actavis (*i.e.*, Allergan), Endo, Purdue, Mallinckrodt and Cephalon were members of the HDA.[144] The HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between manufacturers and distributors at high executive levels.

285.    In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[145] Clearly, the HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the manufacturers and distributors.

---

[144] <u>Manufacturer Membership</u>, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/membership/manufacturer.
[145] <u>Manufacturer Membership Benefits</u>, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistributio.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en.

286.    The application for manufacturer membership in the HDA further indicates the

level of connection that existed between the RICO Defendants.[146] The manufacturer membership

application must be signed by a "senior company executive," and it requests that the

manufacturer applicant identify a key contact and any additional contacts from within its

company.  The HDA application also requests that the manufacturer identify its current

distribution information and its most recent year-end net sales through any HDA distributors,

including but not limited to, Defendants AmerisourceBergen, Cardinal Health, and McKesson.[147]

287.    After becoming members, the distributors and manufacturers were eligible to

participate on councils, committees, task forces, and working groups, including:

    a.  Industry Relations Council: "This council, composed of distributor and
manufacturer members, provides leadership on pharmaceutical distribution
and supply chain issues."[148]

    b.  Business Technology Committee: "This committee provides guidance to HDA
and its members through the development of collaborative e-commerce
business solutions.  The committee's major areas of focus within
pharmaceutical distribution include information systems, operational
integration and the impact of e-commerce."  Participation in this committee
includes distributors and manufacturer members.[149]

    c.  Health, Beauty and Wellness Committee: "This committee conducts research,
as well as creates and exchanges industry knowledge to help shape the future
of the distribution for health, beauty and wellness/consumer products in the
healthcare supply chain."  Participation in this committee includes distributors
and manufacturer members.[150]

    d.  Logistics Operation Committee: "This committee initiates projects designed to
help members enhance the productivity, efficiency and customer satisfaction
within the healthcare supply chain.  Its major areas of focus include process
automation, information systems, operational integration, resource
management and quality improvement."  Participation in this committee
includes distributors and manufacturer members.[151]

---

[146] Manufacturer Membership Application, Healthcare Distribution Alliance, (accessed on September 14, 2017),
https://www.healthcaredistribution-org/~/media/pdfs/membership/manufacturer-membership-
application.ashx?la=en.
[147] Id.
[148] Councils and Committees, Healthcare Distribution Alliance, (accessed on September 14, 2017),
https://www.healthcaredistribution.org/about/councils-and-committees.
[149] Id.
[150] Id.
[151] Id.

   e.  Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel.  Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.[152]
   f.  Bar Code Task Force: Participation includes distributor, manufacturer, and service provider members.[153]
   g.  e-Commerce Task Force: Participation includes distributor, manufacturer, and service provider members.[154]
   h.  ASN Working Group: Participation includes distributor, manufacturer, and service provider members.[155]

288.    Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies.  It also creates and exchanges industry knowledge of interest to contract and chargeback professionals."  Participation includes distributor and manufacturer members.[156]

289.    The councils, committees, task forces, and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

290.    The HDA also offers a multitude of conferences, including annual business and leadership conferences.  The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[157]  The conferences also gave the Manufacturer and Distributor Defendants

---

[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] Business and Leadership Conference – Information for Manufactures, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.

"unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[158]  The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership.  And it is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[159]

291.    Third, the RICO Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

292.    The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[160]  As reported in the Washington Post, identified by Senator McCaskill, and acknowledged by the HDA, there is an industry-wide practice whereby the manufacturers paid the distributors rebates and/or chargebacks on their prescription opioid sales.[161]  On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants.  In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship

---

[158] *Id.*

[159] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

[160] Lenny Bernstein & Scott Higham, The government's struggle to hold opioid manufacturers accountable, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphica/investigations/dea-mallinckrodt/:utm_term=.b24cc81cc356; *see also*, Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letters from Sen. Claire McCaskill, (March 28, 2017), https://www.mccaskill.senate.gov/opioid-investigation; Purdue Managed Markets, Purdue Pharma, (accessed on September 14, 2017), http://www.purduepharma.com/payers/managed-markets/.

[161] *Id.*

notices, and invoices.[162]  The Manufacturer Defendants used this information to gather high-level

data regarding overall distribution and direct the Distributor Defendants on how to most

effectively sell the prescription opioids.

293.    The contractual relationships among the RICO Defendants also include vault

security programs.  The RICO Defendants are required to maintain certain security protocols and

storage facilities for the manufacture and distribution of their opiates.  Plaintiffs are informed

and believe that manufacturers negotiated agreements whereby the manufacturers installed

security vaults for distributors in exchange for agreements to maintain minimum sales

performance thresholds.  Plaintiffs are informed and believe that these agreements were used by

the RICO Defendants as a tool to violate their reporting and diversion duties in order to reach the

required sales requirements.

294.    Taken together, the interaction and length of the relationships between and among

the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation

between two groups in a tightly knit industry.  The Manufacturer and Distributor Defendants

were not two separate groups operating in isolation or two groups forced to work together in a

closed system.  The RICO Defendants operated together as a united entity, working together on

multiple fronts, to engage in the unlawful sale of prescription opioids.  The HDA and the Pain

Care Forum are but two examples of the overlapping relationships and concerted joint efforts to

accomplish common goals and it demonstrates that the leaders of each of the RICO Defendants

were in communication and cooperation.

295.    According to articles published by the Center for Public Integrity and The

Associated Press, the Pain Care Forum – whose members include the Manufacturers and the

---

[162] Webinars, Healthcare Distribution Alliance, (accessed on September 14, 2017),
https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

Distributors' trade association – has been lobbying on behalf of the Manufacturers and Distributors for "more than a decade."[163] And, from 2006 to 2016 the Distributors and Manufacturers worked together through the PCF to spend over $740 million lobbying in the nation's capital and in all 50 statehouses on issues including opioid-related measures.[164] Similarly, the HDA has continued its work on behalf of distributors and manufacturers, without interruption, since at least 2000, if not longer.[165]

296.     As described above, the RICO Defendants began working together as early as 2006 through the PCF and/or the HDA to promote the common purpose of their enterprise. Plaintiffs are informed and believe that the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

## Conduct of the Opioid Diversion Enterprise

297.     During the time period alleged in this Complaint, the RICO Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their federal and state obligations to identify, investigate, and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, to halt such unlawful sales and, in doing so, to increase production quotas, and generate unlawful profits, as follows:

298.     Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

---

[163] Matthew Perrone, <u>Pro-Painkiller echo chamber shaped policy amid drug epidemic</u>, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), <u>https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic</u>.
[164] <i>Id</i>.
[165] <u>HDA History</u>, Healthcare Distribution Alliance, (accessed on September 14, 2017), <u>https://www.healthcaredistribution.org/about/hda-history</u>.

299.    Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

300.    Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

301.    Defendants paid nearly $800 million dollars to influence local, state, and federal governments through joint lobbying efforts as part of the PCF.  The RICO Defendants were all members of the PCF, either directly or indirectly, through the HDA.  The lobbying efforts of the PCF and its members, included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the manufacturers' and distributors' registrations for failure to report suspicious orders of opioids.

302.    The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

303.    The RICO Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "ensuring Patient Access and Effective Drug Enforcement Act."[166]

---

[166] *See* <u>HDMA is now the Healthcare Distribution Alliance</u>, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcemtne-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_stirt.gtnkl; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-ble9-a05d3c21f7cfstory.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/201702/18/dea-agent-we-had-no-leadership-in-wv-amit-flood-of-pain-pills-.

304.    The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales.  Plaintiffs are informed and believe that the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured.  Plaintiffs are informed and believe that the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

305.    The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year, by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the RICO Defendants.

306.    The Distributor Defendants developed "know your customer" questionnaires and files.  This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[167] On information and belief, the "know your customer" questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

---

[167] Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf); Richard Widup, Jr., Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion:  Beyond the PDMA, Purdue Pharma and McQuite Woods LLC, (available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

307.    The RICO Defendants refused to identify, investigate, and report suspicious

orders to the DEA when they became aware of same despite their actual knowledge of drug

diversion rings.  The RICO Defendants refused to identify suspicious orders and diverted drugs

despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant

actions between 2008 and 2012[168] and 117 recommended decisions in registrant actions from

The Office of Administrative Law Judges.  These numbers include 76 actions involving orders to

show cause and 41 actions involving immediate suspension orders – all for failure to report

suspicious orders.[169]

308.    Defendants' scheme had decision-making structure that was driven by the

Manufacturer Defendants and corroborated by the Distributor Defendants.  The Manufacturer

Defendants worked together to control the state and federal government's response to the

manufacture and distribution of prescription opioids by increasing production quotas through a

systematic refusal to maintain effective controls against diversion, and identify and report

suspicious orders to the DEA.

309.    The RICO Defendants worked together to control the flow of information and

influence state and federal governments and political candidates to pass legislation that was pro-

opioid.  The Manufacturer and Distributor Defendants did this through their participation in the

Pain Care Forum and Healthcare Distributors Alliance.

310.    The RICO Defendants also worked together to ensure that the Aggregate

Production Quotas, Individual Quotas, and Procurement Quotas allowed by the DEA stayed high

and ensured that suspicious orders were not reported to the DEA.  By not reporting suspicious

---

[168] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.
[169] *Id.*

orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no

basis for refusing to increase or decrease the production quotas for prescription opioids due to

diversion of suspicious orders.  The RICO Defendants influenced the DEA production quotas in

the following ways:

    a.   The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

    b.   The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, councils, committees, task forces, and working groups;

    c.   The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioid prescriptions filled by the Distributor Defendants;

    d.   The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

    e.   The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids;"[170]

    f.   The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

    g.   The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

    h.   The RICO Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

    i.   The RICO Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributor Defendants by the DEA for failure to report suspicious orders; and

    j.   The RICO Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

311. The scheme devised and implemented by the RICO Defendants amounted to a

common course of conduct characterized by a refusal to maintain effective controls against

---

[170] Harriet Ryan, et al., More than 1 million OxyContin pills ended up in the hands of criminals and addicts.  What the drugmaker knew, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projcts/la-me-oxycontin-part2/.

diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

## Pattern of Racketeering Activity

312. The RICO Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1961(D)), by the felonious manufacture, importation, receiving, concealment by selling, or otherwise dealing in a controlled substance or listed chemical (as defined in Section 102 of the Controlled Substance Act), punishable under any law of the United States.

### *The RICO Defendants Engaged in Mail and Wire Fraud*

313. The RICO Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, and the American public by knowingly conducting or participating in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

314. The RICO Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1431 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Diversion Enterprise. The RICO Defendants participated in the scheme to defraud by using

mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

315.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

316.    In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.  For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally, and knowingly with the specific intent to advance the illegal scheme.

317.    The RICO Defendants' predicate acts of racketeering (10 U.S.C. § 1961(1)) include, but are not limited to:

    a.  Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.
    b.  Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

318.    The RICO Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the manufacturers, distributors, or

third-parties that were foreseeably caused to be sent as a result of the RICO Defendants' illegal

scheme, including but not limited to:

    a.   the prescription opioids themselves;
    b.   documents and communications that facilitated the manufacture, purchase, and unlawful sale of prescription opioids;
    c.   defendants' DEA registrations;
    d.   documents and communications that supported and/or facilitated Defendants' DEA registrations;
    e.   documents and communications that supported and/or facilitated the Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;
    f.   defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;
    g.   documents and communications related to the Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;
    h.   documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports, and correspondence;
    i.   documents for processing and receiving payment for prescription opioids;
    j.   payments from the distributors to the manufacturers;
    k.   rebates and chargebacks from the manufacturers to the distributors;
    l.   payments to Defendants' lobbyists through the Pain Care Forum;
    m.   payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;
    n.   deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and
    o.   other documents and things, including electronic communications.

319.    On information and belief, the RICO Defendants (and/or their agents), for the

purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or

received) by mail or by private or interstate carrier, shipments of prescription opioids and related

documents by mail or by private carrier affecting interstate commerce, including the following:

320.    Purdue manufactures multiple forms of prescription opioids, including but not

limited to: OxyContin®, MS Contin®, Dilaudid®/Dilaudid® HP, Butrans®, Hysingla® ER, and

Targiniq™ ER.  Purdue manufactured and shipped these prescription opioids to the Distributor

Defendants.

321.    The Distributor Defendants shipped Purdue's prescription opioids throughout the United States.

322.    Cephalon manufactures multiple forms of prescription opioids, including but not limited to: Actiq® and Fentora®.  Cephalon manufactured and shipped these prescription opioids to the Distributor Defendants.

323.    The Distributor Defendants shipped Teva's (Cephalon's) prescription opioids throughout the United States.

324.    Janssen manufactures prescription opioids known as Duragesic®.  Janssen manufactured and shipped its prescription opioids to the Distributor Defendants.

325.    The Distributor Defendants shipped Janssen's prescription opioids throughout the United States.

326.    Endo manufactures multiple forms of prescription opioids, including but not limited to: Opana®/Opana® ER, Percodan®, Percocet®, and Zydone®.  Endo manufactured and shipped its prescription opioids to the Distributor Defendants.

327.    The Distributor Defendants shipped Endo's prescription opioids throughout the United States.

328.    Actavis manufactures multiple forms of prescription opioids, including but not limited to: Kadin® and Norco®, as well as generic versions of the drugs known as Kadian®, Duragesic® and Opana®.  Actavis manufactured and shipped its prescription opioids to the Distributor Defendants.

329.    The Distributor Defendants shipped Actavis' prescription opioids throughout the United States.

330.    Mallinckrodt manufactures multiple forms of prescription opioids, including but not limited to: Exalgo® and Roxicodone®.

331.    The Distributor Defendants shipped Mallinckrodt's prescription opioids throughout the United States.

332.    The RICO Defendants also used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities.  Specifically, the RICO Defendants made representations about their compliance with federal and state laws requiring them to identify, investigate, and report suspicious orders of prescription opioids and/or diversion of same into the illicit market.

333.    At the same time, the RICO Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids, and that they complied with all state and federal regulations regarding the identification and reporting of suspicious order of prescription opioids.

334.    Plaintiffs are also informed and believe that the RICO Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

335.    The RICO Defendants also communicated by U.S. Mail, interstate facsimile, and interstate electronic mail, as well as with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

336.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and the public that Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions

112

of doses of prescription opioids to divert into the illicit drug market.  The RICO Defendants'

scheme and common course of conduct was intended to increase or maintain high production

quotas for their prescription opioids from which they could profit.

337.    Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate

wire facilities have been deliberately hidden and cannot be alleged without access to Defendants'

books and records.  But, Plaintiffs have described the types of, and in some instances, occasions

on which the predicate acts of mail and/or wire fraud occurred.  They include thousands of

communications to perpetuate and maintain the scheme, including the things and documents

described in the preceding paragraphs.

338.    The RICO Defendants did not undertake the practices described herein in

isolation but as part of a common scheme.  These actions violate 18. U.S.C. § 1962(c).  Various

other persons, firms, and corporations, including third-party entities and individuals not named

as defendants in the Complaint, may have contributed to and/or participated in the scheme with

the RICO Defendants in these offenses and have performed acts in furtherance of the scheme to

increase revenues, increase market share, and/or minimize the losses for the RICO Defendants.

339.    The RICO Defendants aided and abetted others in the violations of the above

laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343

offenses.

340.    The RICO Defendants hid from the general public and suppressed and/or ignored

warnings from third-parties, whistleblowers, and governmental entities about the reality of the

suspicious orders that the RICO Defendants were filling on a daily basis – leading to the

diversion of a tens of millions of doses of prescription opioids into the illicit market.

341.    The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

342.    Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders.

343.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

344.    The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants while Plaintiffs were left with substantial monetary losses through the damage that the prescription opioid epidemic caused.  The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme.

345.    The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other.  Likewise, Defendants are distinct from the enterprise.

346.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and upon information and belief, will continue into the future.

347.     Many of the precise dates of the RICO Defendants' criminal actions at issue here have been hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise alleged herein depended upon secrecy.

348.     Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including the Plaintiffs and the proposed Class Members. Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on consumers, Plaintiffs, or the proposed Class Members.  In designing and implementing the scheme, at all times Defendants were cognizant of the fact that those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third-parties to provide objective and reliable information regarding Defendants' products and their manufacture and distribution of those products.

349.     By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

350.     It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiffs as set out herein, by allowing the flow of prescription opioids from appropriate medical channels into the illicit drug market.

351.     The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

115

### *The RICO Defendants Manufactured, Sold and/or Dealt in*
### *Controlled Substances and Their Crimes Are Punishable as Felonies*

352.    The RICO Defendants conducted and participated in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(D) by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in Section 102 of the Controlled Substance Act), punishable under any law of the United States.

353.    The RICO Defendants committed crimes that are punishable as felonies under the laws of the United States.  Specifically, 21 U.S.C. § 483(a)(4) makes it unlawful for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under this subchapter.  A violation of Section 483(d)(1).

354.    Each of the Rico Defendants qualify as registrants under the CSA.  Their status as registrants under the CSA requires that they maintain effective controls against diversion of controlled substances in Schedule I or II, design and operate a system to disclose to the registrant suspicious orders of controlled substances, and inform the DEA of suspicious orders when discovered by the registrant.  21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

355.    Pursuant to the CSA and Code of Federal Regulations, the RICO Defendants were required to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

356.    The RICO Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders and/or omitted material information from reports, records, and other documents required to be filed with the DEA, including the Manufacturer Defendants' applications for production quotas.  Specifically, the

RICO Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

357.    For example, the DEA and DOJ began investigating McKesson in 2013 regarding its monitoring and reporting of suspicious controlled substances orders.  On April 23, 2015, McKesson filed a Form-8-K announcing a settlement with the DEA and DOJ wherein it admitted to violating the CSA and agreed to pay $150 million and have some of its DEA registrations suspended on a staggered basis.  The settlement was finalized on January 17, 2017.[171]

358.    Purdue's experience in Los Angeles is another striking example of Defendants' willful violation of the CSA and Code of Federal Regulations as it relates to reporting suspicious orders of prescription opioids.  In 2016, the Los Angeles Times reported that Purdue was aware of a pill mill operating out of Los Angeles yet failed to alert the DEA.[172]  The LA Times uncovered that Purdue began tracking a surge in prescriptions in Los Angeles, including one prescriber in particular.  A Purdue sales manager spoke with company officials in 2009 about the prescriber, asking "[s]houldn't the DEA be contacted about this?" and adding that she felt "very certain this is an organized drug ring."[173]  Despite knowledge of the staggering amount of pills being issued in Los Angeles, and internal discussion of the problem, "Purdue did not shut off the supply of highly addictive OxyContin® and did not tell authorities what it knew about Lake Medical until several years later when the clinic was out of business and its leaders indicted.  By

---

[171] McKesson, McKesson Finalizes Settlement with U.S. Department of Justice and U.S. Drug Enforcement Administration to Resolve Past Claims, About McKesson / Newsroom / Press Releases, (January 17, 2017), http://www.mckesson.com/about-mckesson/newsroom/press-releases/2017/mckesson-finalizes-settlemetn-with-doj-and-dea-to-resolve-past-claims/.
[172] Harriet Ryan, et al., More than 1 million OxyContin pills ended up in the hands of criminals and addicts.  What the drugmaker knew, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.
[173] Id.

that time, 1.1 million pills had spilled into the hands of Armenian mobsters, the Crips gang, and other criminals."[174]

359.    Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation for its opioid practices.  Specifically, in 2011, the DEA targeted Mallinckrodt arguing that it ignored its responsibility to report suspicious orders as <u>500 million</u> of its pills ended up in Florida between 2008 and 2012.[175]  After six years of DEA investigation, Mallinckrodt agreed to a settlement involving a $35 million fine.  Federal prosecutors summarized the case by saying that Mallinckrodt's response was that everyone knew what was going on in Florida but they had no duty to report it.[176]

360.    Plaintiffs are informed and believe that the foregoing examples reflect the RICO Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74.  This conclusion is supported by the sheer volume of enforcement actions available in the public record against the Distributor Defendants.[177]  For Example:

361.    On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances.  On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

---

[174] *Id.*

[175] Lenny Bernstein & Scott Higham, <u>The government's struggle to hold opioid manufacturers accountable</u>, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/:utm_term=.b24cc81cc356.  This number accounted for 66% of all oxycodone sold in the State of Florida during that time.

[176] *Id.*

[177] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

362.    On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

363.    On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

364.    On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

365.    On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

366.    On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

367.    On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility.  The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia

("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

368.    On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Lakeland Facility for failure to maintain effective controls against diversion of oxycodone;

369.    On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland Facility; and

370.    On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA, as well as failure to identify and report suspicious orders at its facilities in Aurora, Colorado, Aurora, Illinois, Delran, New Jersey, La Cross, Wisconsin, Lakeland, Florida, Landover, Maryland, La Vista, Nebraska, Livonia, Michigan, Methuen, Massachusetts, Santa Fe Springs, California, Washington Courthouse, Ohio and West Sacramento, California.

371.    These actions against the Distributor Defendants confirm that distributors knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA.  These actions also demonstrate, on information and belief, that the Manufacturer Defendants were aware of the enforcement against their distributors and the diversion of the prescription opioids and a corresponding duty to report suspicious orders.

372.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future.

373. Many of the precise dates of Defendants' criminal actions at issue herein were hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise depended upon the secrecy of the participants in that enterprise.

374. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar members. Defendants calculated and intentionally crafted the diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on consumers, Plaintiffs, and the proposed Class Members.

375. By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

376. It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiffs as set out herein, by allowing the flow of prescription opioids from appropriate medical channels into the illicit drug market.

377. The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

**Damages**

378. The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs and the proposed Class Members injury in their businesses, as described above in language expressly incorporated herein by reference.

379.    Plaintiffs' and the proposed Class Members' injuries were proximately caused by Defendants' racketeering activities.  But for the RICO Defendants' conduct, Plaintiffs and the proposed Class Members would not have incurred the monetary losses described above and expressly incorporated herein by reference.

380.    Plaintiffs' and the proposed Class Members' injuries were directly caused by the RICO Defendants' racketeering activities.

381.    Plaintiffs seek actual damages, treble damages, attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest.

C.      **COUNT III**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**18 U.S.C. 1962(d),** *et seq*.
**(Against All Defendants)**

382.    Plaintiffs reallege and incorporate by reference all preceding paragraphs, and allege as follows on behalf of themselves and the proposed Class.

383.    Plaintiffs' and the proposed Class Members' injuries were proximately caused by Defendants' racketeering activities.  But for the RICO Defendants' conduct, Plaintiffs and the proposed Class Members would not have incurred the monetary losses described above and expressly incorporated herein by reference.

384.    Defendants conspired to violate Section 1962(c), as alleged more fully above, by conducting the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity, as incorporated by reference below.

122

**The Opioid Diversion Enterprise**

385.    For efficiency and avoiding repetition, for purposes of this claim, Plaintiffs incorporate by reference Paragraphs 265 through 296 concerning the Opioid Diversion Enterprise.

**Conduct of the Opioid Diversion Enterprise**

386.    For efficiency and avoiding repetition, for purposes of this claim, Plaintiffs incorporate by reference Paragraphs 297 through 311 concerning the Opioid Diversion Enterprise.

**Pattern of Racketeering Activity**

387.    For efficiency and avoiding repetition, for purposes of this claim, Plaintiffs incorporate by reference Paragraphs 312 through 377 concerning the Opioid Diversion Enterprise.

**Damages**

388.    The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs and the proposed Class Members injury in their businesses, as described above in language expressly incorporated herein by reference.

389.    Plaintiffs bring this claim against all RICO Defendants.  At all relevant times, the RICO Defendants were associated with the Opioid Diversion Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  Under Section 1962(d), it is unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.  18 U.S.C. § 1962(d).

390.     Plaintiffs' and the proposed Class members' injuries were directly caused by the RICO Defendants' racketeering activities.

391.     Plaintiffs seek actual damages, treble damages, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

**D.     COUNT IV**

**<u>NEGLIGENCE</u>**
**(Against All Defendants)**

392.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 251 hereof, and allege as follows on behalf of themselves and the proposed Class.

393.     Under state law, to establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom.  All such essential elements exist here.

394.     Each Defendant had duties to exercise reasonable or due care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs.

395.     Each Defendant breached its aforesaid duties by its conduct previously specified herein.

396.     Each Defendant owed its aforesaid duties to the Plaintiffs and the Members of the proposed Class because the injuries alleged herein were foreseeable by the Defendants.

397.     Plaintiffs and the Members of the proposed Class seek compensatory damages for their monetary losses previously specified herein, plus interest and the costs of this action.

E.     **COUNT V**

**WANTONNESS, RECKLESSNESS, AND GROSS NEGLIGENCE**
**(Against All Defendants)**

398.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 251 hereof, and allege as follows on behalf of themselves and the proposed Class.

399.     Defendants' aforesaid acts and omissions were done and omitted knowing that injury to Plaintiffs and the Class Members would likely or probably result; were done or omitted with a reckless or conscious disregard of the rights of Plaintiffs and the Class Members; were done or omitted without the exercise of even a slight degree of care; were done or omitted with conscious indifference to the consequences; and/or constituted a substantial deviation from the standard of care applicable.

400.     As a direct and proximate result of Defendants' wantonness, recklessness, or gross negligence, Plaintiffs and the Class Members were monetarily damaged as aforesaid. Plaintiffs seek compensatory and punitive damages, plus the costs of this action.

F.     **COUNT VI**

**COMMON LAW FRAUD**
**(Against All Defendants)**

401.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 251 hereof, and allege as follows on behalf of themselves and the proposed Class.

402.     As alleged herein, Defendants made false representations and concealed material facts about opioids.

403.     Defendants made misrepresentations and failed to disclose material facts to physicians and consumers throughout the United States: to induce the physicians to prescribe and administer opioids and consumers to purchase and consume opioids, as set forth herein.

404.    Defendants' false representations and omissions were material and were made and omitted intentionally or recklessly.

405.    Defendants intended that physicians and consumers would rely upon their misrepresentations and omissions.

406.    Physicians and consumers reasonably relied on Defendants' misrepresentations and omissions.  Physicians prescribed and administered opioids and consumers purchased and consumed opioids, as set forth herein.

407.    Because of physicians' and consumers' reliance on Defendants' misrepresentations and omissions of material fact, Plaintiffs and the Class Members have suffered monetary damages as aforesaid.  Plaintiffs seek compensatory and punitive damages, plus the costs of this action.

G.    COUNT VII

## STRICT LIABILITY
### (Against All Defendants)

408.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 251 hereof, and allege as follows on behalf of themselves and the proposed Class.

409.    Opioids are dangerous products and should only be used under direct care in a hospital or in-house facility as set out in the Porter and Jick Study ("Addiction Rate in Patients Treated with Narcotics" N. Engl. J. Med 1980).  Defendants' action and inaction risked the lives of consumers and users of their products.  In fact, given that the highly addictive opioids are used outside an in-house treatment center or other facility, Defendants' actions and inactions regarding the production and distribution of opioids constitute strict liability and negligence *per se*.

126

410.    Defendants directly or indirectly caused opioids to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs' patients with opioid conditions.

411.    The Defendants owed Plaintiffs, Class Members, and other consumers a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling opioids, including the duty to take all reasonable steps necessary to ensure the product was not unreasonably dangerous to its consumers and users.  The Defendants owed Plaintiffs, Class Members, and other consumers a duty to warn of the dangers associated with opioid use.

412.    At all times material hereto, Defendants had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers of the manufacture and distribution of opioids.

413.    Defendants had a duty to disclose to health care professionals, treatment facilities, and consumers the causal relationship or association of opioids to the development of Plaintiffs' injuries.

414.    Defendants' duty of care owed to consumers, health care professionals, treatment facilities, and patients with opioid conditions included providing accurate information concerning: (1) the clinical safety and effectiveness profiles of opioids with the dangers of addiction, and (2) appropriate, complete, and accurate warnings concerning the adverse effects of opioids, including the injuries suffered by Plaintiffs.

415.    During the time that Defendants designed, manufactured, packaged, labeled, promoted, distributed, and/or sold opioids, Defendants knew, or in the exercise of reasonable care should have known, that their product was defective, dangerous, and otherwise harmful to Plaintiffs' patients with opioid conditions.

416.    Defendants knew, or in the exercise of reasonable care should have known, that the use of opioids could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to users of the products and entities who treat patients with opioid conditions.

417.    Defendants knew that many health care professionals were prescribing opioids and that many patients developed serious side effects, including but not limited to addiction, overdose, and death.

418.    Defendants had duties to exercise reasonable or due care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs in interstate commerce, in that Defendants knew and had reason to know that consumers' use and ingestion of opioids created a significant risk of suffering addiction, death, and overdose, in turn, causing Plaintiffs' injuries, and failed to prevent or adequately warn of the severity of these risks and injuries.

419.    Defendants were further negligent in that they manufactured and produced opioids, knew and were aware of the defects inherent in the product, failed to act in a reasonably prudent manner in designing, testing, and marketing the products, and failed to provide adequate warnings of the product's defects and risks.  Defendants further refused to exercise reasonable or due care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs.

420.    The Defendants failed to exercise due care under the circumstances, and their negligence includes the following acts and omissions:

      a.  Defendants engaged in massive production, promotion, and distribution of opioids for use by individuals.
      b.  Defendants' actions created and expanded the market for opioids, promoting its wide use for pain management.
      c.  Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs.

      d.   Defendants knew, or should have known, that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

421.    Defendants knew, and/or should have known, that it was foreseeable that consumers, health care professionals, and Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of opioids.

422.    Consumers did not know the nature and extent of the injuries that could result from ingestion and use of opioids.

423.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

424.    Defendants' conduct, as described above, was reckless. Defendants' action and inaction risked the lives of consumers and users of their products, thereby increasing costs of treatment to Plaintiffs and Class Members.

425.    As a foreseeable, direct, and proximate consequence of Defendants' actions, omissions, and misrepresentations, Plaintiffs suffered serious cost increases in treatment of patients harmed by opioids. In addition, consumers require and will continue to require healthcare and treatment services, provided by Plaintiffs and Class Members. Plaintiffs have incurred, and will continue to incur, serious economic loss and other losses and damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand that the issues contained herein be tried by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask

that the Court:

(a)    certify the Class proposed herein;

(b)    appoint Plaintiffs as representatives of the Class;

(c)    appoint Plaintiffs' counsel as attorneys for the Class;

(d)    enter judgment awarding Plaintiffs and the Class Members monetary damages,
       compensatory in nature on their negligence claim;

(e)    enter judgment awarding Plaintiffs and the Class Members monetary damages,
       compensatory and punitive, on their claims for wanton, reckless, and grossly
       negligent conduct, and on their claims for fraud;

(f)    enter judgment awarding Plaintiffs and the Class Members treble damages on
       their RICO claims;

(g)    award Plaintiffs and the Class Members prejudgment interest and post-judgment
       interest as provided by law;

(h)    award Plaintiffs and the Class Members a reasonable attorney's fee and costs; and

(i)    provide such further relief as may be just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves, the Class Members, and the general public at large,

demand a trial by jury on all issues so triable.

Respectfully submitted this the 23rd day of August, 2018.

/s/ John Arthur Eaves, Jr.

John Arthur Eaves, Jr. (MS Bar #8843)
Eaves Law Firm, LLC
101 North State Street
Jackson, MS  39201
(601) 355-7961 – Telephone
(601) 355-0530 – Facsimile
johnjr@eaveslawmail.com
Attorney for Plaintiffs